**Kenneth BARNEBEY, et al., Plaintiffs,**

v.

**E.F. HUTTON & CO., et al.,
Defendants.**

No. 87–1420–CIV–T–17(C).

United States District Court,
M.D. Florida,
Tampa Division.

June 19, 1989.

Michael C. Addison, Addison, Ketchey & Horqan, P.A., Tampa, Fla., and Martin T. Fletcher, Sr., Rothberg, Gallmeyer, Fruechtenicht & Logan, Fort Wayne, Ind., for plaintiffs.

Lloyd S. Clareman, Mark E. Segall and Douglas R. Pappas, Myerson & Kuhn, New York City, Eurich Z. Griffin, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, Fla., James E. Saunders, Holliman, Langholz, Runnels & Dorwat, Tulsa, Okl., and Edward C. LaRose, Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, Fla., for defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

The cause is before the Court on the following motions, responses, and supporting documentation:

1. Plaintiffs' motion for summary judgment on Count VI (Oklahoma non-registration claim), filed January 6, 1989.

2. Affidavit Martin T. Fletcher, Sr. in support of Plaintiffs' motion for summary judgment on Count VI, filed January 6, 1989.

3. Defendant E.F. Hutton & Company's motion for partial summary judgment on Count VI and memorandum of law in support thereof, filed January 9, 1989.

4. Plaintiffs' memorandum of law in support of motion for summary judgment on Count VI, filed January 11, 1989.

5. Defendant E.F. Hutton & Company's memorandum of law in opposition to Plaintiffs' motion for summary judgment on Count VI, filed February 6, 1989.

6. Defendant Viking Energy Management Company, Inc.'s joinder in E.F. Hutton and Company's opposition to Plaintiffs' motion for summary judgment on Count VI, filed February 3, 1989.

7. Supplementary affidavit of Douglas R. Pappas, filed February 10, 1989.

8. Plaintiffs' memorandum in opposition to E.F. Hutton and Company's motion for summary judgment on Count VI, filed February 13, 1989.

9. Plaintiffs' motion for summary adjudication that Oklahoma Securities Act applies to sales and for summary judgment on E.F. Hutton and Company's affirmative defenses 12 and 22, filed December 2, 1988.

10. Plaintiffs' memorandum of law in support of motion for summary judgment that Oklahoma Securities Act applies to sales, filed December 2, 1988.

11. Defendant E.F. Hutton and Company's memorandum of law in opposition to Plaintiffs' motion for summary judgment that the Oklahoma Securities Act applies to sales, filed December 22, 1988.

12. Defendant Viking Energy Management Company, Inc.'s joinder in opposition to Plaintiffs' motion for summary judgment that Oklahoma Securities Act applies to sales, filed December 27, 1988.

13. Plaintiffs' reply to E.F. Hutton and Company's "Conflict of Laws" argument, filed January 1, 1989.

14. Plaintiffs' supplemental authority in support of their motion for summary judgment that the Oklahoma Securities Act applies to sales, filed February 27, 1989.

15. Defendant E.F. Hutton & Company's supplemental memorandum in support of motion for summary judgment on conflict of laws, filed March 1, 1989.

16. Plaintiff John M. Miller's motion for summary judgment on Count I (non-registration under Section 517.07, Florida Statutes) and memorandum in support thereof, filed January 4, 1989.

17. Defendant E.F. Hutton & Company's motion for partial summary judgment on Count I, filed January 9, 1989.

18. Defendant E.F. Hutton & Company's memorandum in support of their motion for partial summary judgment on Count I and in opposition to Plaintiff John M. Miller's motion for summary judgment on Count I, filed January 20, 1989.

19. Affidavit of James Mofsky, filed January 20, 1989.

20. Affidavit of Mark E. Segall, filed January 20, 1989.

21. Defendant Viking Energy Management Company, Inc.'s joinder in support of Defendant E.F. Hutton & Company's motion for partial summary judgment on Count I and in opposition to Plaintiff John M. Miller's motion for summary judgment on Count I, filed January 20, 1989.

22. Plaintiffs' motion to strike affidavit of Professor James Mofsky and memorandum of law in support thereof, filed February 3, 1989.

23. Affidavit of Martin Fletcher, filed February 8, 1989.

24. Plaintiffs' reply to E.F. Hutton & Company's motion for summary judgment on Count I, filed February 8, 1989.

25. Defendants' memorandum in opposition to Plaintiffs' motion to strike affidavit, filed February 22, 1989.

26. Defendant E.F. Hutton & Company's motion for summary judgment on alleged oral misrepresentations and memorandum of law in support thereof, filed January 9, 1989.

27. Plaintiffs' memorandum in opposition to motion for summary judgment on alleged oral misrepresentations, filed February 3, 1989.

28. Affidavit of Martin Fletcher, filed February 3, 1989.

29. Plaintiffs' motion for summary judgment as to Defendants' counterclaims and memorandum of law in support thereof, filed December 12, 1988.

30. Defendant E.F. Hutton & Company's memorandum in opposition to motion for summary judgment as to counterclaims, filed January 12, 1989.

31. Plaintiffs' motion for summary judgment as to certain affirmative defenses, filed January 6, 1989.

32. Plaintiffs' memorandum of law in support of motion for summary judgment as to certain affirmative defenses, filed January 11, 1989.

33. Defendant E.F. Hutton & Company's memorandum in opposition to motion for summary judgment as to certain affirmative defenses, filed February 13, 1989.

34. Defendant Viking Energy Management Company, Inc.'s joinder in memorandum in opposition to motion for summary judgment as to certain affirmative defenses, filed February 13, 1989.

35. Defendant E.F. Hutton & Company's motion for partial summary judgment against Plaintiffs Barnebey, Griffins, and Summit Bank and memorandum of law in support thereof, filed January 9, 1989.

36. Plaintiffs' memorandum in opposition to motion for summary judgment as to Plaintiffs Barnebey, Griffins and Summit Bank, filed February 3, 1989.

37. Affidavit of Martin Fletcher of February 9, 1989.

38. Affidavit of Douglas R. Pappas, filed January 9, 1989.

39. Affidavit of John M. Miller, filed January 4, 1989.

40. Affidavit of Mark E. Segall, filed December 22, 1988.

41. Affidavit of William Turchyn, Jr. and four (4) volume appendix thereto, filed December 22, 1988.

42. Two volume appendix to Plaintiffs' motions for summary judgment, filed December 22, 1988.

43. Plaintiffs' motion to submit supplemental authority in opposition to motion for summary judgment on alleged oral misrepresentations, filed March 29, 1989.

44. Defendant Hutton's response to motion to submit supplemental authority, filed April 4, 1989.

45. Plaintiffs' objection to Hutton's "Response to Plaintiff's Motion to Submit Supplemental Authority", filed April 19, 1989.

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–7 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

> In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322, 106 S.Ct. at 2552–53, at 273.

The Court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.*, at 324, 106 S.Ct. at 2553, at p. 274.

This cause of action was removed to this Court on September 22, 1987. Plaintiffs filed an amended complaint on January 15, 1988. The complaint alleged the following facts as relevant to the causes of action asserted:

1. Defendant Viking Energy Management Company, Inc. (VEMCO or Viking) was the sole general partner in VEMCO 1981 Private Drilling Program (VEMCO 1981).

2. Defendant E.F. Hutton & Company (Hutton) owned sixteen percent (16%) of the stock of Viking. Through its ownership of stock in Viking and its position as exclusive sales agent for Viking's various limited partnerships, including VEMCO 1981, Hutton had direct and/or indirect control over Viking.

3. On or about March 13, 1981, Hutton entered into an agreement with Viking, wherein Hutton agreed to act, and did thereafter act, as the exclusive sales agent for Viking and VEMCO 1981, for the purpose of selling limited partnership interests in the limited partnership to the public.

4. Each Plaintiff purchased thirty (30) units of the limited partnership, through the same Hutton account executive in Sarasota, Florida, for an aggregate initial consideration of $150,000.00 each, of which $50,000.00 was paid in cash, and $100,000.00 was to be paid by the assumption of a portion of a capital loan to VEMCO 1981, supported by a letter of credit.

5. The units of the limited partnership were securities pursuant to 15 U.S.C. 77b. In connection with the sales Defendants utilized and delivered to Plaintiffs a private offering memorandum dated March 1, 1981, and other documents and letters. Also in connection with the sale, Hutton utilized and delivered a document known as a "Blue Top", or communicated the substance of the Blue Top to Plaintiffs orally.

6. The documents used or given to Plaintiffs contained untrue statements of material fact and/or failed to disclose material facts necessary to make the statements made not misleading.

7. In connection with the sales, Hutton, for itself and as agent of Viking, made certain oral representations to Plaintiffs. These oral representations were untrue.

8. Under the terms of the limited partnership agreement Viking/and or VEMCO 1981 had the right to call for limited partners to pay certain additional assessments, subject to review by Hutton in accordance with the terms of the sales agency agreement. Failure to pay an assessment would result in a reduction in proportionate ownership. Assessments were made starting in November, 1981, and through January, 1982, in a sum equal to twenty-five percent (25%) of the original investments, or $37,500.00 for each Plaintiff. All Plaintiffs paid the assessment.

9. In connection with the assessments, Defendants made untrue statements of material fact and/or omitted to disclose material facts.

10. Plaintiffs exercised reasonable diligence and due care in investing, but were unaware of the false statements and failure to disclose material facts.

11. Each Plaintiff retains all the units of VEMCO 1981 purchased and each hereby tenders such units to Defendants.

The amended complaint contained the following cause of actions against Defendants:

I. Violation of Florida Securities and Investor Protection Act (failure to register), Chapter 517, Florida Statutes. Plaintiffs seek rescission of the sales.

II. Violation of Florida Securities and Investor Protection Act, specifically Section 517.301, Florida Statutes. Plaintiffs seek rescission of the sales.

III. Common law fraud under Florida law. Plaintiffs seek rescission of the sales. (This count was voluntarily dismissed by Plaintiffs and approved by the Court, by order of March 1, 1989.)

IV. Violation of 15 U.S.C. Section 77*l*(2). Plaintiffs seek rescission of the sales.

V. Violation of Indiana Code Annotated Section 23-2-1-12 in connection with sale to Sidney Hutner. Personal representative Summit Bank seeks rescission of the sale to the deceased Hutner.

VI. Violation of Oklahoma Securities Act. Plaintiffs seek rescission of the sales.

VII. Violation of 15 U.S.C. Section 78j(b) and Rule 10b-5. (This count was voluntarily dismissed by Plaintiffs and approved by the Court by order of March 1, 1989.)

On June 30 and July 1, 1988, Defendants Hutton and Viking respectively filed answers, affirmative defenses, and counterclaims against Plaintiffs Kenneth Barnebey, John M. Miller, Lloyd Griffin, Marcelene Griffin, and Summit Bank as Personal Representative of the Estate of Sidney Hutner. The counter-complaints contained the following counts:

1. Indemnification based on the subscription agreements signed by Plaintiffs and agreement to indemnify for damages, costs, and fees incurred by reason of representations and warranties in agreement.

2. Fraud based on representations of the subscription agreement being misrepresentations and omission of material facts.

## I. MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS

### FINDINGS OF FACT

1. Counts I of the counterclaims seeks indemnity from all Plaintiffs for any judgment which Plaintiffs might recover herein and is based on the express indemnity provisions contained in the Subscription Agreements signed by each Plaintiff (in the case of Plaintiff Summit Bank the agreement was signed by the deceased Sidney M. Hutner). The Subscription Agreements were signed in April and May of 1981. The specific indemnity clauses in the agreements read:

*Indemnification.* The undersigned acknowledges that he understands the meaning and legal consequences of the representations, warranties and covenants in paragraphs 4, 6 and 7 hereof and the Partnership, the General Partner, and the Sales Agent who has solicited this subscription have relied upon such representations, warranties and covenants, and he hereby agrees to indemnify and hold harmless the Partnership, each Limited Partner thereof, the General Partner, the Sales Agent and their respective officers, directors, controlling persons, agents and employees, from and against any and all loss, damage or liability together with all costs and expenses (including attorneys' fees and disbursements), which any of them may incur by reason of (a) any breach of any representation, warranty, covenant or agreement of the undersigned contained in this Agreement, (b) any false, misleading or inaccurate information contained in, or any breach of the representations, warranties, covenants and agreements of the undersigned in the Offeree Questionnaire executed by the undersigned, or (c) any breach of any covenant or agreement of the undersigned contained in the Partnership Agreement. Notwithstanding the foregoing, however, no representation, warranty, acknowledgement or agreement made herein by the undersigned shall in any manner be deemed to constitute a waiver of any rights granted to him under federal or state securities laws. All representations, warranties and covenants contained in this paragraph 5, shall survive the acceptance of this subscription and the formation of the Partnership.

2. Count II of the counterclaims seek damages for fraud based on the theory that Plaintiffs made certain false representations and warranties in the Subscription Agreements.

3. It is undisputed that each Plaintiff (or in the case of Summit Bank, the deceased Sidney M. Hutner) made certain representations to Defendants in the Subscription Agreement, including:

a. The undersigned has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the Partnership or (if applicable) the undersigned and his Offeree Representative together have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of the prospective investment.

b. The undersigned has received and read and is familiar with the Private Offering Memorandum, including the exhibits thereto, and any amendments or supplements thereto, and he confirms that he and (if applicable) his Offeree

Representative have been furnished all materials relating to the Partnership and its proposed activities, the offering of Units or anything set forth in the Private Offering Memorandum which they have requested and have been afforded the opportunity to obtain any additional information necessary to verify the accuracy of any representations or information set forth in the Private Offering Memorandum.

c. The undersigned and (if applicable) his Offeree Representative have had a full opportunity to ask questions of and receive satisfactory answers from the General Partner, or any person or persons acting on the General Partner's behalf, concerning the terms and conditions of this investment, and all such questions have been answered to the full satisfaction of the undersigned.

d. The undersigned represents that (i) it has been called to his attention, both in the Private Offering Memorandum and by those individuals with whom he has dealt in connection with his investment in the Partnership, that the Partnership is newly organized and has no history of operation or earnings, and that the undersigned's investment in the Partnership involves a very high degree of risk which may result in the loss of the total amount of his investment, and (ii) no assurances are or have been made regarding the tax advantages which may inure to the benefit of the Limited Partners of the Partnership, nor has any assurance been made that existing tax laws and regulations will not be modified in the future, thus denying to the Limited Partners of the Partnership all or a portion of the tax benefits which may presently be available under existing tax laws and regulations.

e. The undersigned has received no representations or warranties (other that any contained in the Private Offering Memorandum) from the General Partner or its affiliates, or its employees or agents, including the Sales Agent, and, in making his investment decision, he is relying solely on the information contained in the Private Offering Memorandum

and investigations made by him or (if applicable) his Offeree Representative.

4. Plaintiffs' claims in this cause include claims that Plaintiffs were induced to purchase limited partnership interests in VEMCO 1981 by oral misrepresentations and other misrepresentations, from sources other than the Private Offering Memorandum. The claims are asserted pursuant to 15 U.S.C. § 77*l*(2), the Oklahoma Securities Act, and the Florida Securities Act.

5. Based on the representations of Plaintiffs and the indemnification clause of the Subscription Agreement, Defendants conclude that: 1) Plaintiffs represented that they had not received nor relied on anything outside the Private Offering Memorandum in deciding to invest in VEMCO 1981; 2) the complaint asserts receipt and reliance on representations beyond the offering; 3) if Plaintiffs prevail on the "other representation claims" they have breached the representations of the Subscription Agreement; and 4) therefore, Plaintiffs are liable to Defendants on the two counts of the counterclaim.

6. Plaintiffs in their motion assert that summary judgment is appropriate because: 1) enforcement of the indemnity clause would be contrary to public policy; 2) the parties agreed that Plaintiffs' representations would not be used as a basis for Plaintiffs' waiver of rights under securities laws; 3) enforcement of Plaintiffs' representations as a basis for the counterclaims is prohibited by the anti-waiver provisions of the securities laws; and 4) enforcement of the indemnity clause would be contrary to the special provisions of the statutes which regulate imposition of litigation costs and attorney fees.

7. The Court notes at this juncture that Defendants, contrary to Plaintiffs' interpretation of the counterclaims, state clearly in their memorandum that *"assuming arguendo that plaintiffs successfully maintain an action on oral misrepresentations, there would be no indemnification. Defendants only seek indemnity for fees and costs incurred in defending against plaintiffs' non-meritorious claims which have triggered the indemnity clause."*

Insofar as the language of the counterclaims may be inartfully drafted on this point, the Court considers this statement as an amendment to the counterclaims.

8. The counterclaims seek indemnification only for attorneys' fees and costs on any unsuccessful claims of oral misrepresentation. As Defendants concede that they only seek indemnity for fees and costs on unsuccessfully claims of oral misrepresentation, the Court does not have to address the question of whether or not the indemnity clause, as to complete indemnification, is against public policy and/or unenforceable as to any *judgment* obtained by Plaintiffs. The question before the Court is whether or not Defendants' counterclaims for indemnity of attorneys' fees and costs are to go to the finder of fact.

DISCUSSION

PUBLIC POLICY

■ Plaintiffs rely on the case of *Doody v. E.F. Hutton & Co., Inc.*, 587 F.Supp. 829 (D.Minn.1984), for the proposition that the enforcement of the indemnity clause here would violate public policy. In *Doody* plaintiffs purchased limited partnership interests in private oil and gas tax shelters, one shelter involved there, as here, was VEMCO 1981, and signed subscription agreements containing integration and indemnity clauses. The integration clauses there, as here, essentially stated that no information beyond the partnership agreement had been relied on in making the investment and that no inconsistent oral representations had been made.

The *Doody* court had under consideration plaintiffs' motion for summary judgment on defendants' counterclaims. That court granted the motion and stated:

> The Court finds that enforcing an indemnity provision such as the one in the instant action would discourage prospective plaintiffs from bringing securities fraud actions whenever there is an integration clause in a subscription agreement. Prospective plaintiffs would be discouraged because the plaintiffs would be running the risk of incurring substantial liability for attorneys' fees and costs. Since the securities laws are a remedial

measure intended to encourage the prosecution of securities fraud actions, the Court refuses to enforce this indemnity provision. Of course, as stated herein the subscription agreement may be used at trial as evidence of plaintiffs' non-reliance on the alleged oral misrepresentations. *Id.*, at 833.

Defendants oppose the dismissal of their counterclaims on the grounds of public policy and cite *Zissu v. Bear, Stearns & Co.*, 627 F.Supp. 687 (S.D.N.Y.1986); *aff'd on other grounds*, 805 F.2d 75 (2nd Cir.1986), in support of their position. Plaintiff in *Zissu* was a senior partner in a New York City law firm who had engaged extensively in security transactions. In 1981, the plaintiff purchased shares in a limited partnership which engaged in drilling for oil and gas.

In making the purchases, the plaintiff executed a series of documents wherein he: 1) set forth his experience in making such purchases; 2) represented he had the requisite experience and knowledge to evaluate the risks involved; 3) represented he could bear the economic risk; and 4) represented he knew that the partnership was newly organized, had no history, and was speculative. In the subscription agreement, the plaintiff agreed to indemnify the partnership from loss, damage or liability "due to or arising out of a breach of any representation or warranty."

Subsequently, the purchaser brought suit charging that "he was induced to execute a subscription agreement to purchase ... by untrue statements of material fact and omissions of material facts in original and supplemental selling documents." At trial the jury verdict was in favor of defendants. Plaintiff filed a motion for a judgment notwithstanding the verdict, based on several arguments, including that the indemnity agreement was in violation of public policy.

In considering the public policy question, the court found that the indemnification clause did not deter the plaintiff from filing suit nor need it deter others from suing to

protect their rights under the security laws. The court went on to state:

> The only potential chilling effect is on those investors who make representations in a subscription agreement which they later repudiate. It would discourage such investors from using their own fraudulent conduct in order to bring unjustified lawsuits.

> The indemnification provision does not permit the defendants to recover attorneys' fees because Zissu sued them for alleged violations of the securities laws. It was triggered, as already noted, by plaintiff's own conduct when he breached the representations which caused loss and damage to the defendants. It was his representations upon which defendants relied in selling the limited partnership shares to plaintiffs. Zissu was the one who made the counterclaims possible ... [Not] only is enforcement of this indemnification clause not contrary to securities law policies, but the securities laws authorize courts to award attorneys' fees on these facts ... Where an investor repudiates warranties previously made for the purpose of bringing suit, enforcement of the indemnification clause comports with existing policies of the securities laws.

> Finally, as defendants note, SEC Rule 146 required them to ascertain whether plaintiff was capable of evaluating the risks of investment or financially able to bear the risk ... If this indemnification agreement is not enforceable, it would undermine the securities laws to the extent that investors would be free to make misrepresentations with impunity and issuers would be wholly unable to accurately assess the qualifications of potential investors in risky ventures such as this one. (footnotes omitted) *Id.*, at 693.

The court of appeals did not address the question of the public policy vitiation of the indemnity clause because it found the contract clause was not specific enough, under New York law, to assess attorneys' fees. The trial court assessment of attorneys' fees was affirmed based on finding the lawsuit frivolous, pursuant to Section 11(e) of the 1933 Securities Act.

The Court has reviewed the motion for summary judgment and response, and, in particular, the two cases cited previously. The Court finds the reasoning of the *Zissu* to be more persuasive on the issue of public policy. Therefore, the motion for summary judgment based on a public policy argument is denied.

## ENFORCEABILITY OF CLAUSE

■ As to this assertion, Plaintiff alleges that the first portion of the indemnification clause conflicts with the latter portion of the clause, wherein the agreement states that "no representation, warranty, acknowledgement or agreement made herein by the undersigned shall in any manner be deemed to constitute a waiver of any rights granted to him under federal or state securities laws," and that it constitutes an unenforceable waiver of rights under the securities laws.

As pointed out by the trial judge in the *Zissu* case, enforcement of this indemnity clause need not, and indeed in this case did not, deter, investors from suing to enforce rights. Rather Judge Weinfeld stated such indemnity clauses would discourage plaintiffs utilization of fraudulent conduct in order to bring an unjustified suit. Judge Weinfeld further concluded that, rather than being contrary to securities laws policy, the awarding of fees and costs may be authorized by 15 U.S.C. § 77k(e). The Court, as it has stated earlier finds the *Zissu* opinion well reasoned and persuasive authority. The allegations that the indemnity clause is prohibited by law or agreement are unpersuasive.

## FRAUD (COUNT II)

■ Plaintiffs final argument in the motion is that Count II of the counterclaims for common law fraud are contrary to public policy, contrary to the Subscription Agreements, and prohibited by statutory anti-waiver provisions. The requisite elements of common law fraud are 1) a material misrepresentation which is 2) false, 3) which is known to be false, is 4) made with the intention that it be acted upon, and 5) it is relied on with 6) resulting damages. *Community Bank v. Bank of Hallandale,*

482 F.2d 1124, 1127 (5th Cir.1973). These elements have been sufficiently pled in the counterclaims. The Court finds the motion for summary judgment as to Count II to be without merit. Therefore, the motion for summary judgment on the counterclaims is denied on all remaining issues.

## II. MOTION FOR SUMMARY JUDG-MENT ON AFFIRMATIVE DEFENSES

On March 1, 1989, this Court granted Plaintiffs' motion to voluntarily dismiss Counts III and VII of the amended complaint. Count III alleged common law fraud under Florida law and Count VII alleged violation of 15 U.S.C. Section 78j(b) and Rule 10b–5 (federal anti-fraud). In this motion for summary judgment Plaintiffs seek a ruling that as a matter of law, the following affirmative defenses are not defenses to the remaining claims of the amended complaint:

1. Both defendants' first affirmative defenses, failure to state a claim.

2. Both defendants' third affirmative defenses, estoppel by admissions in subscription agreements.

3. Defendant Hutton's fourth affirmative defense, disclaimer of representation by Hutton.

4. Defendant Hutton's fifth affirmative defense, disclaimer of intent to warrant.

5. Defendant Hutton's seventh and Defendant Viking's fourth affirmative defenses, Plaintiffs by reasonable care ought to have known of false statements and omissions.

6. Defendant Hutton's eighth and Defendant Viking's fifth affirmative defenses, Plaintiffs barred by receipt of tax benefits with knowledge of their claim.

7. Defendant Hutton's eleventh affirmative defense, good faith defense of Section 15 of the Securities Act.

8. Defendant Hutton's thirteenth and twenty-first affirmative defenses, Hutton was not a seller of the units. (Defendants withdrew these affirmative defenses; therefore, this issue is moot).

9. Defendant Hutton's sixteenth and Defendant Viking's thirteenth affirmative defenses, Plaintiffs failed to mitigate damages.

10. Defendant Hutton's eighteenth and Defendant Viking's ninth affirmative defenses, decline in value was not caused by false statements and omissions.

11. Defendant Hutton's nineteenth and Defendant Viking's tenth affirmative defenses, offering was exempt under Section 4(2) of the Securities Act of 1933.

12. Defendant Hutton's twenty-third affirmative defense, no knowledge of facts pertaining to the allegations as to violation of registration provisions of Oklahoma Securities Act. (Defendant withdrew this affirmative defenses; therefore, this issue is moot.)

In their response to this motion for summary judgment, Defendants withdrew certain affirmative defenses and mooted two of the issues raised in the motion for summary judgment. Defendants affirmative defenses numbers one state that the amended complaint fails to state a claim upon which relief can be granted. Defendants had a choice bringing this defense by separate motion or as an affirmative defense. Defendants chose to state a general denial of the amended complaint. The Court does not find the affirmative defenses in question, as a matter of law, to be inappropriate defenses.

■ Defendants third affirmative defense asserts Plaintiffs' admissions in the subscription agreements estop them from claiming they "justifiably relied" upon any purported oral or written representations outside the Private Offering Memorandum. Insofar as these defenses assert the subscription agreements as evidence of non-reliance on representations beyond the offering memo, these affirmative defenses are appropriate. Insofar as these defenses might be an attempt to state that Plaintiffs waived, merely by the signing of the agreements, any rights under the securities laws and are precluded from bringing suit, they should be dismissed.

■ Defendant Hutton's affirmative defenses four and five state that the all representations in the offering memorandum

were those of Viking and that Plaintiffs are estopped from asserting claims against Hutton because of the express notice given to them in the memorandum that the representations were not warranted by Hutton. Pursuant to 15 U.S.C. § 77*l*, liability is imposed on one who sells a security by use of a prospectus or oral statement containing an untrue statement of a material fact. The one employing such a prospectus has the burden of proving that "he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission."

Defendant Hutton asserts that these two defenses relate to their contention that Plaintiffs are barred by the statute of limitations from recovering for alleged misstatements in the offering memorandum and to the claim that the inconsistent oral statements are "trumped" by the written disclosures.

The Court finds affirmative defenses four and five, as much expressions of evidentiary proof' relevant to other defenses; statute of limitations and effect of inconsistent oral statements are separate affirmative defenses. The Court agrees that the mere disclaiming of any intent to warrant the truthfulness of the prospectus is insufficient to carry the burden established by 15 U.S.C. § 77*l*. With those caveats in mind, the Court will grant the motion for summary judgment as to the fourth and fifth affirmative defense of Defendant Hutton.

■ Defendant Hutton's seventh and Viking's fourth affirmative defenses assert that Plaintiffs knew, or with reasonable care should have known, of any untruth or omission in the offering memorandum. Plaintiffs only seek summary judgment as to the second assertion, that "in the exercise of reasonable care" they should have known of the untruths and omissions. Plaintiffs contend that there is no duty under Section 12(2) of the 1933 Securities Act or the Oklahoma Act that a plaintiff exercise reasonable care to discover if the information is false. Defendants do not dispute this contention, but state the disputed section of affirmative defenses seven

is relevant to the issue of the statute of limitations defenses asserted.

Since there is no dispute that the cited part of defenses four and seven is irrelevant to proof of a claim under Section 12(2) and the Oklahoma Act, language to which objection is made is found to be inapplicable to those issues. Insofar as that portion of these defenses relate to the issue of statute of limitations, summary judgment is inappropriate.

■ The next defenses at issue are Defendant Hutton's defense eight and Defendant Viking's defense five. These affirmative defenses assert that rescission is not available to Plaintiffs because they continued to exercise the incidents of ownership by benefitting from tax losses after they knew or should have known of their alleged claims.

The Court has previously addressed the issue of tax benefits and the claim for rescission. This Court's order of September 7, 1988, concluded that tax benefit evidence is irrelevant to a claim for rescissionary damages, but is relevant to whether or not rescission is an appropriate remedy and the Court is entitled to consider the role of the tax benefits in the investment decision. The relevant defense is appropriate only insofar as it asserts the acceptance of tax benefits as an element in the Court's determination of whether or not rescission is an appropriate remedy; otherwise, the motion for summary judgment is well-taken.

■ Plaintiffs next seek summary judgment on Defendant Hutton's eleventh affirmative defense, which states that Hutton maintained and enforced adequate systems of training and internal control to prevent its account executives and other employees from making unauthorized oral representations or committing violations of the securities laws. The defense further states that Hutton acted in good faith, did not directly induce the acts constituting the alleged violations, and had no knowledge or reasonable grounds to believe in the existence of the alleged facts by reason of which its liability for acts of its employees is alleged to exist.

Plaintiffs assert that this defense is an attempt to state an affirmative defense pursuant to the controlling person "good faith" defense of 15 U.S.C. Section 77*o*. Defendants assert that the defense is not directed to the good faith defense of Section 77*o*, but that it is related to Plaintiffs' section 12(2) claims (and analogous state claims), and questions as to whether or not Hutton employees were acting beyond the scope of their authority thus negating *respondeat superior* liability. Therefore, insofar as defense eleven makes an attempt to assert a good faith defense pursuant to 15 U.S.C. Section 77*o* the motion for summary judgment should be granted.

Affirmative defenses sixteen (Defendant Hutton) and thirteen (Defendant Viking) assert that Plaintiffs failed to take reasonable steps to mitigate their damages. Defendant Hutton's eighteenth and Defendant Viking's ninth affirmative defenses states that decline in the value of VEMCO 1981 units did not result from the alleged defects in the offering memorandum or other alleged misstatements or omissions. Defendants state in their opposition to the motion that these defenses go to Counts III (Florida common law fraud) and VII (violation of Rule 10b(5)) and that if those counts were dismissed the defenses would be withdrawn. As noted previously, Counts III and VII were dismissed on March 1, 1989, on Plaintiffs' voluntary motion. Therefore, the motion of summary judgment on these defenses should be granted.

■ The final issue of this motion for summary judgment goes to Defendant Hutton's nineteenth and Defendant Viking's tenth affirmative defenses. Those defenses assert that the offering of the VEMCO partnership units was exempt from registration with the Securities and Exchange Commission by virtue of Section 4(2) of the Securities Act of 1933 and/or by virtue of Rule 146. The Court finds that Defendants' assertion that these defenses are pertinent to claims of non-registration under Oklahoma law (which are the subject of separate motions for summary judgment discussion found at Section VII of this or-

der) to be well taken and the motion for summary judgment should be denied.

## III. MOTION FOR SUMMARY JUDGMENT ON ALLEGED ORAL MISREPRESENTATIONS

Defendant Hutton's motion seeks summary judgment on all counts of the amended complaint insofar as they allege oral misrepresentations in connection with the VEMCO 1981 investments on the grounds that: 1) they are barred by the statute of limitations; 2) they are nonactionable as a matter of law; and 3) Plaintiffs are estopped by their subscription warranties from alleging oral misrepresentations.

### STATUTE OF LIMITATIONS

The applicable statute of limitations have been established for the remaining individual counts as follows:

1. Counts I and II, violation of the Florida Securities Act, two years from the date when Plaintiffs discovered, or should have discovered, with the exercise of due diligence, but in all events not more than five years from the occurrence of such violation.

2. Count IV, violation of Section 12(2) of the Securities Act, one year from discovery, or from when one should have discovered, with exercise of due diligence, but in all events no more than three years from the date of the sale of the securities.

3. Count V, violation of Indiana Code Ann. Section 23–2–1–19(e), three years from date Plaintiff discovered the facts giving rise to the violation.

4. Count VI, violation of Oklahoma Securities Act in fraud and non-registration, fraud-two years from date when Plaintiffs discovered, or should have discovered with reasonable diligence, and non-registration-three years from the date of the sale.

Initially Defendants assert that, if they can demonstrate that Plaintiffs were on notice of the facts giving rise to their claims more than two years prior to the filing of this action, Counts I, II, and IV should be dismissed in their entirety and Count VI should be dismissed insofar as it

alleges material misrepresentation and omissions.

It is further the position of Defendants that the alleged oral misrepresentations were expressly contradicted by the offering memorandum and, thereby, Plaintiffs were put on notice as soon as they received the offering memorandum. Defendants assert that Plaintiffs received their offering memorandums before the execution of the subscription agreements, which were executed as follows: Kenneth Barnebey on May 1, 1981; John M. Miller, April 22, 1981; Lloyd and Marcelene Griffin on April 17, 1981; and Sidney Hutner on May 1, 1981.

The Court has previously addressed the issue of statute of limitations in its OR-DER ON MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE FOR A STAY, filed May 5, 1988. The Court made the following findings of fact which are relevant to this motion:

1. Each Plaintiff purchased a limited partnership interest in VEMCO '81. Plaintiffs subscribed to make their original purchases in the period March to April, 1981. Viking executed the acceptance portions of the subscription agreements on June 18, 1981, and the offering closed on June 22, 1981.

2. Each Plaintiff also paid a voluntary assessment, requested by Viking, during the period November, 1981 to January, 1982.

3. On May 17, 1983, an action was filed in the United States District Court for the Southern District of Indiana. The case is *Klawans, et al. v. E.F. Hutton & Co., Inc., et al.*, Case No. IP 83–680–C. The Klawans suit has continuously asserted putative class claims under certain counts of the complaint.

4. The Klawans action was filed more than one (1) year but less than two (2) years after the Plaintiffs' original investment in VEMCO '81.

Defendants assert that the only "tolling" available to Plaintiffs Barnebey, the Griffins, and Summit Bank is tolling pursuant to *American Pipe & Const. Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). The *American Pipe* doctrine states that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class, who would have been parties had the suit been permitted to continue as a class action, if the statute had not already run. *Crown, Cork & Seal v. Parker,* 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). Defendants assert that even assuming the filing of the *Klawans* action would otherwise toll the limitations periods, all of the statutes had run prior to that filing because Plaintiffs had notice of their claims as of May 16, 1981.

As to Counts I and II, alleging violations of the Florida Securities Act, where a security is sold by contract the "contract of sale" is the sale. The trigger for the "violation" of the Florida securities act occurs when the purchaser contracts to buy the security. *Armbrister v. Roland International Corp.,* 667 F.Supp. 802, 823 (M.D.Fla.1987). The sale of these securities occurred with the acceptance of the subscriptions by Viking on June 18, 1981.

Defendants have previously told this Court to assume that the filing of the *Klawans* action tolled the limitations periods which had not already expired. Therefore, taking the date of sale as June 18, 1981, if the *Klawans* action was filed before June 18, 1983, Counts I and II are not barred by the statute of limitations. The *Klawans* action was in fact filed May 17, 1983, less than two years from the sales of the securities. Therefore, for the purposes of this motion for summary judgment the Court finds that Counts I and II of the complaint are not time-barred.

Count V of the complaint relates to the claims of Summit Bank, as personal representative for Sidney Hutner. Mr. Hutner subscribed on May 1, 1981. The applicable statute of limitations for Count V is three years from the date of discovery of the facts giving rising to the violation. Even assuming, only as to Count V, that the deceased Mr. Hutner discovered the facts on the date of his subscription, he had three years or until May 1, 1984, to file suit. If the Court further accepts Defen-

dants assumption that the filing of the *Klawans* action tolled the running of the statute, it is again clear that Count V is not time-barred in this cause.

The remaining counts in question are IV and VI. Count VI is governed by two limitations periods: as to the fraud it is two years from discovery, or when one should have discovered; and, for the non-registration claims, it is three years from the date of sale. *Armbrister*, at 823. As the Court has previously stated, the date of sale was June 18, 1981, and the filing of *Klawans* was less than two years from that date. Making the same assumptions as previously in this order, the Court concludes that Count VI is not time-barred.

Count IV is governed by a one year statute of limitations from the date of discovery, or from when the violation should have been discovered with the exercise of due diligence, but not more than three years from the sale. As in the Florida securities statute, the limitations period commences on the date of the sale of the securities, June 18, 1981. Therefore, if Plaintiffs knew or should of have known, at the time of purchase, of the facts giving rise to the violation, the statute would have run on June 18, 1982, and would not have been tolled by the filing of *Klawans* because it would have been expired at that time.

■ The question, as to Count IV, and all other counts, if the time period concerning them were not otherwise assumed to be tolled by the filing of the *Klawans* action, is whether or not the applicable statute of limitations had run at the time of the filing of the *Klawans* action, which revolves around when the facts giving rise to the claims were discovered or should have been discovered by the exercise of due diligence. The extent to which a plaintiff exercised due diligence in discovering alleged violations is tested by an objective, rather than subjective, standard. *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987). Generally it is recognized that in most cases the question of the exercise of reasonable or due diligence is a question of fact and not amenable to summary disposi-

tion. However, summary judgment may be appropriate where uncontroverted evidence irrefutably demonstrates that a plaintiff discovered or should have discovered the fraud. *Id.*, at 1417.

■ One way to meet the objective standard may be to show that the oral representations were in material and direct conflict with the written representations in the prospectus or offering memorandum. *Armbrister v. Roland International Corp.*, 667 F.Supp. 802 (M.D.Fla.1987); *Kennedy v. Josephthal & Co.*, 814 F.2d 798 (1st Cir.1987).

This Court in *Armbrister* found that the record as a whole clearly established that with *any diligence* plaintiffs should have known their purchases were suspect. The record in that case was so complete that the Court had no trouble finding that no rational trier of fact could find for the nonmoving party and in granting summary judgment for lack of existence of a genuine issue of material fact.

Defendants here assert that the oral representations were flatly contradicted by the offering memorandum and, therefore, under the reasoning of *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317 (7th Cir. 1988), are non-actionable as a matter of law.

*Acme Propane* holds that where a seller of a security *fully discloses all material information in writing*, conflicting oral misrepresentations are not actionable under Section 12(2). This Court, upon due consideration, finds that there are genuine issues raised by Plaintiffs which preclude this Court from finding that summary judgment is appropriate.

Defendants also assert that the fact that Plaintiffs signed subscription agreements bar this suit on contract law principles, in that the Plaintiffs signed a disclaimer of reliance on any oral representations. As the Court stated in its consideration of the motion for summary judgment on the counterclaims, this waiver is not dispositive of the question of reliance on representations, but made be used at trial as evidence of non-reliance. The question of reliance is a

factual question and is material to the claims raised in this cause of action.

## IV. MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFFS BARNEBEY, GRIFFINS, AND SUMMIT BANK

█ In this fourth motion for summary judgment, Defendants seek summary judgment against Plaintiffs Barnebey, the Griffins, and Summit Bank on the grounds that their claims were filed after the expiration of the applicable statute of limitations and that as to Counts I, II, III (this count was voluntarily dismissed), and V they failed to raise a triable issue of fact concerning claims that the statute of limitations was tolled. The statute of limitations for the relevant counts are as follows:

1. Counts I and II, violation of the Florida Securities Act, two years from the date when Plaintiffs discovered, or should have discovered with the exercise of due diligence, but in all events not more that five years from the occurrence of such violation.

2. Count V, violation of Indiana Code Ann. Section 23-2-1-19(e), three years from date Plaintiff discovered the facts giving rise to the violation.

Defendants assert that beginning on or about May 27, 1982, each Plaintiff was aware that VEMCO 1981 would not produce the results they expected. Further, that despite the notice of problems, Plaintiffs did not file this action until August 1987, and that the statute of limitations on Counts I, II and V have not been tolled by either the filing of the *Klawans* action or by the execution of tolling agreements.

Defendants assert that the *American Pipe* tolling doctrine does not apply to these "new" state individual claims that are not asserted in *Klawans* as class-wide claims. Plaintiffs, on the other hand, urge this Court to find that where the substantive law is essentially identical, and, the fact that the class action claims were based on federal statutes, *American Pipe* tolling is appropriate for the "new" state law claims.

Passage of statutory limitation periods assist in promoting justice by "preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared ..." *American Pipe*, 414 U.S. at 554, 94 S.Ct. at 766. The aim of statute of limitations is met when a class action is filed:

Class members who do not file suit while the class action is pending cannot be accused of sleeping on their rights; ...
And a class complaint "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." (cites omitted) The defendant will be aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class. Tolling the statute of limitations thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification.

*Crown, Cork & Seal v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). The tolling of the statute of limitations remains in effect for all members of the putative class until class certification is denied. *Crown, Cork*, at 354, 103 S.Ct. at 2398.

Counts I, II, and V assert claims pursuant to the Florida Securities Act and the Indiana Code. The *Klawans* action contained both class-wide and individual claims. There are no class-wide claims in *Klawans* asserted pursuant to the Florida or Indiana securities acts, but, some plaintiffs in that action did assert individual claims under the Florida and Indiana statutes. (Ex. H–Pappas Affidavit, Count XII).

This Court agrees with the reasoning of the Second Circuit in *Cullen v. Margiotta*, 811 F.2d 698 (2nd Cir.1987), and finds that the *American Pipe* tolling is properly extended where as here the individual claims involve the same "evidence, memories, and witnesses" as are involved in the putative class action. *Id.*, at 720. Defendants in the *Klawans* action were on notice to pre-

serve evidence concerning the securities act violations, failure to register and misrepresentation, of both Florida and Indiana by the inclusion in that action of claims materially of the same legal identity. The Court incorporates by reference Plaintiffs' memorandum in opposition on these points, specifically pages 3 through 9 and 11 through 15. (This incorporated material is appended to this order as Exhibit A). The Court finds that the filing of the *Klawans* action tolled the statute of limitations related to Counts I, II, and V unless the statute had previously expired.

■ The *Klawans* action was filed May 17, 1983. The Court has now found that the filing of that action tolled the statute of limitations if not previously expired, therefore, the conclusions of this Court in regard to motion for summary judgment on oral misrepresentations may be reinforced. The commencement date for the running of the statute in regard to Counts I and II was the sale of the securities on June 18, 1981, thereby, requiring Plaintiffs to file suit on or before June 18, 1983. The statute of limitations of Counts I and II had not run at the time of the filing of the *Klawans* action and was tolled during the pendency of the putative class action therein.

The relevant statute of limitations on Count V is three years from the date of discovery of the facts giving rise to the violation. As the Court stated previously, even if the Court assumed that discovery of the facts occurred at the time of Mr. Hutner's subscription for purchase, May 1, 1981, the statute would have expired on May 1, 1984. Therefore, the limitations period on Count V had not run at the time of the filing of the class action and was tolled.

Because the Court has determined that the statute of limitations on Counts I, II, and V were tolled by the filing of the *Klawans* action, it is not incumbent upon it to address the issue of whether or not there is a question of fact relating to the existence of tolling agreements.

## V. PLAINTIFF JOHN MILLER'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT I AND DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I

■ Before addressing the motions for summary judgment, the Court must resolve Plaintiffs' motion to strike the affidavit of Professor James Mofsky. Professor Mofsky is a Professor of Law at the University of Miami Law School and is offered as an expert in the area of securities regulation and in particular the Florida Securities Act. Professor Mofsky's affidavit specifically addressed the issue of whether or not Plaintiff John Miller was properly notified of his right to void this security purchase within three (3) days, pursuant to Section 517.061(11)(a)(5), Florida Statutes (1987).

Plaintiffs assert that the affidavit does not present admissible evidence, in that the affidavit is an attempt to instruct the Court on the application of the law, Section 517.-061, to the undisputed facts of this case and the consequent ultimate conclusion as to whether or not the statutory requirements have been satisfied. Upon due consideration of the motion to strike and response, the Court finds Plaintiffs' arguments persuasive and the affidavit of James Mofsky will be stricken.

The primary issue in consideration of the fifth and sixth cross-motions for summary judgment is whether or not Plaintiffs, and in particular John Miller, were properly apprised of their right under the Florida securities laws to void their purchases within three days. The parties agree that there are no disputed issues of fact. In addition to the facts previously set forth in this order, the following facts are relevant to the Court's resolution of the issue:

1. In connection with the purchases of VEMCO 1981 units, each Plaintiff executed subscription agreements. At the time of subscribing Plaintiffs Barnebey, Miller, and the Griffins resided in Florida. Plaintiff Hutner subscribed in Florida. After review of the subscription agreements by both Hutton and Viking, Viking accepted

the subscriptions of all Plaintiffs on or about June 18, 1981.

2. At the time of Plaintiffs subscribing, Florida law provided for exemption from the registration requirements of Section 517.07, Fla.Stat. for certain transactions. Relevant to the securities herein was Section 517.061(12), Fla.Stat. (1981), [recodified as Section 517.061(11)] [hereinafter reference will be to Section 517.061(12) only] which read in relevant part:

(a) The offer or sale, by or on behalf of an issuer, of its own securities that is part of an offering made in accordance with *all* of the following conditions:

1. There are no more than 35 purchasers of the securities of the issuer in this state in any consecutive 12–month period during an offering made in reliance upon this subsection.

2. Neither the issuer nor any person acting on behalf of the issuer shall offer or sell securities pursuant to this subsection by means of any form of general solicitation or general advertising in this state.

3. Prior to the sale, each purchaser or his representative is provided with, or given reasonable access to, full and fair disclosure of all material information.

4. No person defined as a dealer in this chapter shall be paid a commission or compensation for the sale of the issuer's securities unless such person in registered as a dealer under this chapter.

5. When sales are made to five or more persons, any sale made pursuant to this subsection shall be voidable by the purchaser either within 3 days after the first tender of consideration is made by the purchaser to the issuer, an agent of the issuer, or an escrow agent or within 3 days after the availability of that privilege is communicated to the purchaser, whichever occurs later. (emphasis supplied).

3. Also in effect at the time of the VEMCO offering was a rule adopted by the Securities Division of the Controller's Office. The rule required private offering memoranda, such as in the VEMCO 1981 program, contain "[a] statement indicating that the sale shall be voidable by the purchaser within three days of sale, as required by Section 517.061(12)(a)(5)."

4. On or about April 22, 1981, Plaintiff John M. Miller delivered to Defendant Hutton, along with the executed subscription agreement, a check in the amount of $50,000.00 and an executed promissory note in the principal amount of $100,000.00. Miller's check was deposited into an escrow account established pursuant to the Sales Agency Agreement.

5. Pursuant to the Sales Agency Agreement, Defendant Hutton had the right to review the tendered subscription agreements. After such review, Hutton forwarded Plaintiff Miller's subscription agreement to Defendant Viking, who accepted the agreement on June 18, 1981.

6. On or about July 4, 1981, Defendant Viking sent to each Plaintiff, including Plaintiff John Miller, a copy of their executed and accepted subscription agreements.

7. The VEMCO 1981 units were a "security" as defined in the Florida Securities Act, Section 517.021.

8. The VEMCO 1981 program units were not registered under the Florida Securities Act at the time of their offer and sale to Plaintiffs. Defendants assert that the offer and sale were exempt from registration by virtue of the exemption provided by Section 517.061(12).

9. The private offering memorandum received by Plaintiffs in the VEMCO offering contained the following statement at page 31:

*Rights of Voidability or Withdrawal for Florida Subscribers*

If five or more residents of Florida subscribe for Units, each subscription will be voidable by each Florida subscriber within 3 days after submission of his Subscription Agreement to the General Partner. Notice of a Florida subscriber's intent to void or withdraw his subscription should be given in writing to the General Partner at 2761 East Skelly Drive, Tulsa,

Oklahoma 74015. Such notice will be effective if it is in writing and within the two-day or three-day period, as the case may be, is (a) actually received by the General Partner, (b) delivered to a telegraph or other service for transmittal, or (c) deposited in the United States mail, sent by registered or certified mail, and all necessary fees are paid by the sender.

10. There are no other statements, either oral or written, asserted by Defendants to be sufficient to meet the statutory notification requirement as to voidability.

## DISCUSSION

To be entitled to the exemption for non-registered securities, the offer and sale herein had to comply with all five of the conditions set forth in Section 517.061(12). In the instant motions for summary judgment, the condition discussed is 517.-061(12)(a)(5), hereinafter the fifth condition. If Plaintiffs were properly advised of their rights of voidability in the private offering memorandum, Plaintiff Miller's motion for summary judgment must be denied. The party relying on the exemption bears the burden of proof on the issue of whether or not all five of the conditions have been satisfied. *Weinberg v. Pennington,* 462 So.2d 862 (Fla. 3d D.C.A.1985).

The Florida statute clearly requires, that where five or more persons purchase such unregistered securities, the sale is voidable within three (3) days of either: 1) the first tender of consideration from purchaser to issuer, issuer's agent, or escrow agent, or, 2) after the availability of the privilege is communicated to the purchaser, whichever occurs later. By rule, the state provides that such notice of the availability of voidability, as required by the fifth condition, be made in the private offering memorandum.

The private offering memorandum in question here notified purchasers that: 1) if five (5) or more Florida residents subscribed, 2) each Florida subscriber could void his subscription within three (3) days of submission of his subscription agreement to the general partner. The notice section also stated that such notice must be in writing and comply with certain other requirements of the offering memorandum.

Plaintiff Miller asserts that the notice provision fails because of the following defects:

1. The provision purports to restrict the right of avoidance to "residents" of Florida or to circumstances where five or more Florida residents purchased such units, whereas the statute requires only that five or more persons in the state purchase.

The Court, upon review of the pleadings, concludes that the offering memorandum sufficiently notified purchasers that each Florida subscriber had a right to void their subscription. The language is in opposition to the statutory language when it indicates the class of purchasers necessary to crank up the applicability of the statute, but the Court finds this error does not require a finding that Defendants are not entitled to claim the exemption from registration of their security.

2. The offering memorandum purports to make the period of time to exercise such right run from an event different from that specified in the statute. Defendants argue that the offering memorandum allowed Plaintiffs more time to void their purchases, and, therefore, the failure to notify Plaintiffs of the statutory time period *is,* at most, harmless error. The Court cannot agree.

As pointed out by Plaintiffs, the statute allows that the time for voiding a purchase run from either the first notice of the privilege or the first tender of consideration, which ever occurs last. Both of those events are ones of which purchaser would or should be aware, and from which a purchaser could easily calculate the running of the clock on his privilege. The provision in this offering memorandum purports to have the clock run instead from the submission of the subscription agreement to the general partner. This event is not one which a plaintiff would necessarily be aware of until after the fact. That is exactly what happened in this case as to John Miller. Mr. Miller was notified by

letter of July 4, 1981, that his agreement had been submitted to Viking sometime prior to June 18, 1981, (the date Viking accepted the subscription agreement after submission to them by Hutton). At the time of such notification, in excess of the statutory three (3) day voidability period had passed without Plaintiff Miller having sufficient information to allow him to exercise his privilege of voiding his purchase.

The notification provision of the private offering memorandum does not comply with the intent of the statutory language. The statute fixes for a purchaser identifiable events from which he can calculate the period in which he is allowed to void his purchase. The provision of this offering memorandum fails to provide a purchaser with any such pinpoint event. The Court finds that Defendants have failed to carry their burden of demonstrating that they have complied with all conditions precedent to exempt their securities from registration.

■ 3. Finally, Plaintiff asserts that the provision purports to require the exercise of the right in "writing and within the two or three day period, as the case may be," in derogation of the statute. As to the requirement of the offering memorandum that the notice of voidance be in writing, the Court does not find that requirement necessitates finding that the provision does not meet statutory requirements. The only thing required by the statute is that the purchaser be notified of his right to void a purchase pursuant to Section 517.-061(12)(a)(5). The method of exercise of the right is not mandated by the statute. The appropriate method for the purchaser to exercise his right is an open issue and amenable to reasonable requirements of the seller of the security.

■ The second part of this issue is whether or not the inadvertent use in the provision of statement "two-day or three-day period, as the case may be" negates Defendants right to claim they are entitled to utilize the non-registration provisions of the Florida statute. Apparently, the language was by mistake not removed from previous drafts of the provision, which had

previously referred to another state's statute with a two day voidability clause. The Court finds that this error by itself, assuming the remainder of the clause were sufficient, is harmless error and not sufficient to negate the application of the provision.

■ The remaining point for the Court's consideration, as to Plaintiff Miller's motion for summary judgment, is whether summary judgment is appropriate on the amount of recessionary damages to be awarded.

Plaintiff Miller alleges that pursuant to Section 517.211(3), he may recover "the consideration paid for the security, plus interest thereon at the legal rate, less the amount of any income received by the purchaser on the security." Plaintiff's calculations for "consideration paid" is as follows:

| | | |
|---|---|---|
| 4–22–81 | $ 50,000.00 | Cash payment |
| 1–26–82 | 37,500.00 | Cash payment (assessment) |
| 1–18–82 | 4,727.70 | Interest payment on note |
| 5–28–82 | 4,627.17 | " |
| 7–29–82 | 4,600.96 | " |
| 12–17–82 | 4,388.86 | " |
| 6–13–83 | 3,752.75 | " |
| 6–13–83 | 3,226.43 | " |
| 7–2–83 | 3,417.62 | " |
| 7–2–83 | 100,000.00 | Balance due on note |
| | $216,061.49 | Total |

Plaintiff Miller asserts that, as of December 31, 1988, he was also due interest in the amount of $159,875.39, at six percent (6%) interest until July 1, 1982, and thereafter at twelve percent (12%), plus a per diem interest rate of $71.01. Based on Miller's figures, he is asserting that as of May 31, 1989, he was due $226,943.87; $216,061.49 principal, $159,875.39 interest until December 31, 1988, and $10,722.51 interest from December 31, 1988, until May 31, 1989, and interest at $71.01 per diem thereafter.

Defendants dispute Plaintiff Miller's damage calculations. Defendants assert that Miller's "consideration paid" is $187,-500.00; the $150,000.00 initial investment and the $37,500.00 additional assessment. Defendants maintain that the interest payments on the $100,000.00 note taken by Plaintiff Miller for financing that portion of his purchase are not "consideration paid" under the statute and are not therefore recoverable.

Upon due consideration, the Court finds the motion for summary judgment and response inadequate on the question of whether or not the interest paid on the $100,000.00 note was "consideration paid" within the meaning of Section 517.211(3), Fla.Stat. and on the determination of what actual damages are due to Mr. Miller.

## VI. PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION THAT OKLAHOMA SECURITIES ACT APPLIES TO PLAINTIFFS' PURCHASES OF VEMCO 1981 PROGRAM UNITS AND FOR SUMMARY JUDGMENT ON HUTTON'S TWENTY-SECOND AND VIKING'S TWELFTH AFFIRMATIVE DEFENSES

CONFLICTS OF LAWS

 The Court first turns to an issue raised by Defendants in their opposition to this seventh motion for summary judgment. Defendants assert that there exists a conflicts of law issue in this cause and that in addressing that question, the federal court must apply the conflict of laws principles of the forum state in accord with *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Defendants classify the state securities claims of this cause as torts for the purpose of choice of laws analysis, because such securities statutes, also known as Blue Sky laws, are to protect the investing public from fraud. Defendants further contend that Florida courts would apply a "significant relationships" test. The presumption of this test, Defendants assert, is that the law of the state where the injury occurred will apply. Application of the significant relationship to the facts of this case, according to Defendants, will lead to the conclusion that the law of the states of Florida and Indiana govern these claims.

The assertions of Defendants in this case press this Court to assume that there actually exists a conflicts problem, and flowing from that, to determine that Oklahoma law does not apply to the cause. This posture is nearly identical to the posture of Defendants in *Lintz v. Carey Manor Ltd.*, 613

F.Supp. 543 (D.C.Va.1985) and in the *Klawans* class action suit which is so closely related to the claims of this action.

In the *Lintz* case District Judge Kiser promulgated a scholarly opinion on the issue of whether or not a traditional conflicts doctrine should apply to Blue Sky laws. Citing Professor Joseph C. Long, in the *1985 Blue Sky Handbook*, Judge Kiser discusses a "territorial" approach to the question as it applies to the multiple policy objectives behind state securities laws:

There would appear to be two policy bases that could be used by a state for enacting a state securities act. First, the state has a legitimate interest in protecting its citizens in the purchase or sale of securities. The state likewise has a legitimate interest in regulating and controlling securities activities deemed to have taken place at least partially within the borders of the state. *North Star Int'l v. Arizona Corporation Commission*, 720 F.2d 578 (9th Cir.1983). In most cases these policy bases will overlap and lead to the same conflict of law conclusions. Thus it is clear under either basis that the law of Oklahoma will control transactions which physically take place in Oklahoma between two or more Oklahoma residents or citizens.

However, there are situations where the two policy justifications for the securities acts may lead to opposing conflict of laws rules. If, for example, the justification is the protection of its own citizens or residents alone, then the state should have little or no interest in regulating a transaction which happens to take place physically within the state, but between two or more foreign citizens or nonresidents. Correspondingly, the state would have an interest in protecting its citizens when they enter into transactions in other states. Thus, the United States government seeks to protect the interests of American citizens when they travel abroad, and the English courts have often concluded that English law follows the English traveler abroad. On the other hand, if the justification is merely to control securities transactions within its

borders, the state has no legitimate interest in applying its laws to transactions involving its citizens which take place entirely outside the borders of the state.

In actuality, most state securities laws are enacted for both reasons, leaving the question of what is the appropriate scope of the coverage of such acts ... *Id.* at 3–5, 3–6.

Judge Kiser found that such policy objectives support the assertion that where there is some territorial nexus to a transaction, the laws of two or more states may simultaneously apply.

The judge concludes that there was no conflict of laws question presented by the overlapping state securities laws in the *Lintz* case. In doing so, Judge Kiser stated:

I believe that the Defendants are incorrect in viewing this as a conflicts of law question. They accept an unduly narrow view of the authority of the state to regulate securities transactions which have a nexus to the state. Virginia, like other states that have substantially adopted the Uniform Act, has a comprehensive scheme for the regulation of securities. The statute is intended to govern those who sell securities within the state even though incorporated elsewhere and never entering in the state. (cite omitted) ...

It has been suggested that the only limitation on the reach of the statute is that the state have a real nexus to the transaction, i.e. that one or more of the prohibited actions occur in the state. *See Loss, supra,* 71 Harv.L.Rev. 242 ("in this state" is an implied limitation on the scope of the statute.) Section 414 of the Uniform Securities Act is thus helpful as a guide to when a transaction occurs within this state so that the statute is applicable. But in no sense is it a "conflicts" provision, nor should it be.

As explained above by Professor Long, there are legitimate policy objectives behind the enactment of Blue Sky laws. One of these objectives is to govern the actions of those operating within the borders of the state. Long, *supra* at 3–36, 3–37.

... It cannot be disputed that Virginia has a legitimate interest in applying its securities laws to operations conducted within the state, even if aimed at nonresidents ...

The same analysis can be applied to the Blue Sky laws of New Jersey, Florida or any other state. If upon application of the facts a transaction is found to be covered by the statutory scheme developed by those states, then the penalties can be applied. I see no reason why a conflicts of law problem develops if one Blue Sky law provides fewer remedies, lacks an attorneys' fee provision, has a shorter statute of limitations or has a more limited scope than the law of another state. Just as the same act can violate both federal and state statute as well as state common law, so too can it violate several Blue Sky laws simultaneously. There is nothing inconsistent in trying a securities case on multiple theories, and determining liability under each statute that is applicable, so long as the plaintiff is prevented from multiple recoveries. *Lintz,* at 550–551.

*See also, Simms Investment Co. v. E.F. Hutton & Co.,* 699 F.Supp. 543 (M.D.N.C. 1988), wherein district court reversed earlier finding in *Simms Investment Co. v. E.F. Hutton & Co.,* 688 F.Supp. 193 (M.D. N.C.1988), and concluded that the securities of laws of two or more states may be applicable to a single transaction without presenting a conflict of laws question.

The decision of Judge Noland in the *Klawans* action is of particular interest to this Court in deciding this issue. The *Klawans* case is a putative class action now pending in the Southern District of Indiana. The Oklahoma securities claims made in this cause of action are asserted in the *Klawans* action as class-wide claims pursuant to the registration and anti-fraud provision of the Oklahoma Blue Sky law.

In the *Klawans* case Defendants, including E.F. Hutton, filed a motion for partial summary judgment alleging that under the conflict of laws principles of the State of

Indiana the Oklahoma Securities Act did not apply. There the motion was filed subsequent to the finding of that court that the Oklahoma Securities Act applied to the counts asserted under that Blue Sky law. Upon consideration of the motion and response thereto, Judge Noland issued an opinion on February 15, 1989. Therein, the judge concluded that Defendants were not entitled to judgment as a matter of law and denied the motion for summary judgment on the issue of conflict of laws.

As in Defendants response to this motion for summary judgment, the defendants in *Klawans* argued that the application of another state's securities law must "satisfy both a 'nexus' analysis (what the defendants term in their brief as 'standing') and a general conflicts of laws analysis." Defendants in that case relied primarily on the first *Simms* decision requiring a traditional conflicts analysis.

In rejecting the arguments of Defendants in *Klawans*, Judge Noland stated:

The Court is not persuaded that any decision to apply Oklahoma securities law in this case requires a traditional conflicts of laws analysis. First, the primary case upon which the defendants rely has been reconsidered and overruled ... The *Simms* court "firmly concluded that the securities laws of two or more states may be applicable to a single transaction without presenting a conflict of laws question." (cite omitted). That court also stated that "[o]verlapping state securities laws do not present a classic conflict of laws question." (cite omitted). This decision agrees with *Lintz v. Carey Manor Ltd.*, 613 F.Supp. 543 (W.D.Va. 1985). In that case the court found that the applicability of more than one state's securities laws does not present a conflicts of laws issue. This Court is in agreement with cases and authorities, such as *Simms* and the references therein, which hold that application of another state's securities law does not require a traditional conflicts of laws analysis.

Secondly, this Court agrees with the reasoning of the *Simms* court that streamlining the application of another state's securities law and refusing to apply a traditional conflicts analysis

serves several public policy goal. First, the decision obviates the need to enter the labyrinth of ever-shifting conflict of laws jurisprudence. Second, the decision comports with legislative directives to apply state securities statutes in prescribed situations. Third, the "territorial nexus" requirement eliminates any threat of forum shopping. Finally, the decision provides a logical and coherent analysis which will provide both issuers and purchasers of securities notice of which state(s) law is applicable to a given transaction. (cite omitted).

Third, this Court concludes that any decision to apply another state's securities law will inherently acknowledge the public policies which traditional conflicts of laws doctrines seek to protect. A significant concern of conflicts jurisprudence is ensuring that a sufficient nexus exists between the parties and the law sought to be applied. State securities laws are drafted, often from a uniform statute, with a similar concern. State securities laws, such as the Oklahoma statute at issue here, specifically define key elements such as buy, sell, offer and acceptance and thereby direct determinations of whether a securities transaction took place within the state. This helps ensure that a satisfactory nexus exists with the state whose law is sought to be invoked. A court's thorough examination of whether alleged transactions will promote these goals more efficiently than the injection of a traditional conflicts analysis.

In addition to the goals mentioned above, state blue sky laws serve further interests as well. Many if not all such laws are written to protect purchasers of securities, regardless of the security's origin. Such statutes also seek to render liability on securities issuers whose activities within a given state fail to conform to that state's laws. (cites omitted). Thus blue sky laws in general serve similar goals. Conflicts of laws rules, on the other hand, are often developed to facili-

tate a choice between dissimilar, sometimes competing common law provisions of different states. When a securities transaction crosses state lines and the plaintiffs sue under a blue sky law (as in this case), more than one state's blue sky law may apply. In such situation, the issue is not (as defendants would urge) "of the states whose law might apply, which state law will a conflicts analysis indicate is the 'better' choice of law." Rather, the issue is whether the plaintiffs' allegations show a sufficient nexus between the parties and the particular state law pleaded to justify applying that law. This analysis, when coupled with the protections afforded under traditional notions of personal jurisdiction, will promote the goals of blue sky laws and ensure that jurisdiction is proper in all respects in the forum chosen.

The Court has carefully considered the arguments of both sides as to this conflicts issue and concludes that there is no reason to apply a traditional conflicts of laws analysis in this cause to find out whether or not the Oklahoma Securities Act should be applied. The Court finds itself in agreement with the well-reasoned opinion of Judge Noland in the *Klawans* action.

## NEXUS TEST

The next issue for the Court's consideration, as to this seventh motion for summary judgment, is the issue Defendants denominate as the "standing" or nexus issue. This issue involves analysis of whether or not the alleged transactions in this cause establish a sufficient nexus between the state law of Oklahoma and the particular facts and parties.

## FINDINGS OF FACT

1. In the amended complaint, Plaintiffs assert claims pursuant to the Oklahoma Securities Act, specifically, Count VI asserting that the sales were in violation of Sections 101 and 301 of that act.

2. Plaintiffs seek therefore to rescind the purchases of VEMCO 1981 pursuant to Section 408 of the act.

3. In defense thereof, Defendants, by way of affirmative defenses, (Defendant Hutton's twenty-second and Defendant Viking's twelfth defenses) have asserted:

All of the Plaintiffs lack standing to assert claims under the Oklahoma Securities Act because the offers to sell to the plaintiffs did not originate in Oklahoma as required by Section 413(a) and (c) of the Oklahoma Securities Act and, alternatively, because the plaintiffs' offers to buy were not made and accepted in Oklahoma as required by Section 413(a) and (d) of the Oklahoma Securities Act.

4. Section 413 of the Oklahoma Securities Act provides in pertinent part:

(a) Sections 101, 201(a), 301, 404 and 408 apply to persons who sell or offer to sell when (1) an offer to sell is made in this state or (2) an offer to buy is made and accepted in this state.

(c) For purposes of this section, an offer to sell or to buy is made in this state whether or not either party is then in this state when the offer (1) originates from this state or (2) is directed by the offeror to this state and received at the place to which it is directed (or at any post office in this state in the case of a mailed offer).

5. Defendant Viking is an Oklahoma corporation which served as the general partner of VEMCO 1981. Vikings principal place of business at the time of the VEMCO offering was Tulsa, Oklahoma.

6. VEMCO 1981 was an Oklahoma limited partnership, created June 22, 1981 and at all times its principal place of business was Tulsa, Oklahoma.

7. Viking and its legal counsel, in connection with the offering for VEMCO 1981, prepared, in Oklahoma, the following: 1) the Private Offering Memorandum; 2) Subscription Agreements; 3) Promissory Notes; 4) Offeree Questionnaires; and 5) Assumption Agreements.

8. The Articles of Limited Partnership for VEMCO 1981 was prepared by Defendant Viking and its counsel in Oklahoma.

9. On or about March 13, 1981, Defendant Viking entered into a Sales Agency Agreement with Defendant Hutton. The agreement was executed on behalf of Vi-

king in Oklahoma. Pursuant to that agreement Defendant Hutton was granted the exclusive right to solicit purchasers for the VEMCO 1981 offering.

10. Pursuant to the sales agreement, Defendant Viking agreed to use its best efforts to have the partnership units comply with Rule 146 of the Regulations and applicable Blue Sky laws, including specifically Section 401(b)(9)(C) of the Oklahoma Securities Act.

11. By letter dated March 10, 1981, Viking's counsel advised Defendant Hutton that the units were cleared for offering under the Oklahoma Securities Act.

12. The cover page of the VEMCO 1981 Private Offering Memorandum contained the name of Defendant Viking and its Oklahoma address. The offering memorandum identified Defendant Viking as the entity which prepared the memorandum and further stated the memorandum was being furnished by Viking through Defendant Hutton.

13. The completed subscription agreement was to be returned to Defendant Hutton at a Garden City, New York address.

14. The offering memorandum notified prospective investors that Defendant Viking would attempt to furnish any additional information or opportunity for inquiry regarding the terms and conditions of the offering and provided a Tulsa, Oklahoma address for making such inquiries.

15. Pursuant to the Sales Agency Agreement, Defendant Viking provided Defendant Hutton with the offering memorandum and subscription documents for distribution to potential investors. As an agent of Defendant Viking, Defendant Hutton delivered to each Plaintiff in this action the VEMCO 1981 Private Offering Memorandum.

16. The subscription agreements, executed by all Plaintiffs in Florida, constituted offers to buy units of VEMCO 1981. The executed agreements, offeree questionnaires, and initial payments were returned to Defendant Hutton.

17. After review pursuant to the Sales Agency Agreement, Defendant Hutton determined not to reject the subscription agreements of any of the Plaintiffs involved in this litigation. Therefore, the agreements were forwarded to Defendant Viking in Oklahoma.

18. The subscription agreements expressly provided that Defendant Viking had final authority to accept or reject the subscription agreement of any potential purchaser. Defendant Viking accepted each of the Plaintiffs as purchasers and on June 18, 1981, executed the agreements by VEMCO in Tulsa, Oklahoma.

19. The VEMCO 1981 offering provided that Defendant Viking, as general partner, could call upon limited partners to make additional capital contributions to the partnership. In November 1981, Viking called for the payment of an assessment. Each Plaintiff in this action paid the requested assessment, in the amount of $37,500.00.

20. The *Klawans* action was pending in the Southern District of Indiana at the time this suit was filed. The class action suit included class-wide claims under Section 408 of the Oklahoma Securities Act, and alleged violation of Sections 101 and 301.

21. In the *Klawans* action, defendants filed a pleading entitled "First Motion for Partial Summary Judgment Against All Plaintiffs" and plaintiffs thereafter filed "Motion for Partial Summary Adjudication and in Opposition to Hutton's First Motion for Summary Judgment (Oklahoma Law)."

22. In their *Klawans* motion for summary judgment, defendants sought to dispose of the counts related to the Oklahoma Securities Act. Defendants argued there that the involvement of Oklahoma was insufficient to invoke application of the Oklahoma Act.

23. Judge Noland issued an order on November 9, 1988, wherein he granted plaintiffs' motion for summary judgment, denied defendants' motion for summary judgment, and found the Oklahoma Securities Act applicable to the *Klawans* action. In support of those findings, Judge Noland found the following to be material facts not in genuine issue:

The Viking Energy Management Company ("VEMCO") is an Oklahoma corporation with its principal office in Tulsa, Oklahoma. Viking Petroleum, Inc., a corporation with principal offices in Tulsa, Oklahoma, owns 84 percent of the stock of VEMCO. E.F. Hutton Group, the parent company of the E.F. Hutton & Company brokerage firm, owns the other 16 percent of VEMCO stock.

In 1981 VEMCO initiated an oil and gas drilling venture known as the VEMCO 1981 Private Drilling Program ("VEMCO 1981"). VEMCO 1981 is an Oklahoma limited partnership; VEMCO is its general partner. VEMCO decided to sell interests (referred to as "program units") in the limited partnership. Pursuant to this decision, VEMCO prepared in Oklahoma several documents, including a private offering memorandum describing the venture to potential investors. The offering memorandum stated that it had been prepared by VEMCO. VEMCO's name and address for further information. The memorandum invited potential investors to contact VEMCO at its Oklahoma address for further information. The memorandum included several forms necessary for the investment, including an offeree questionnaire, an offeree representative questionnaire, a subscription agreement, and an assumption agreement. The memorandum stated that the requisite documents to invest in the venture must be returned to VEMCO. Further, the memorandum indicated that the limited partnership would not be formed until VEMCO decided which subscription offers to accept. The memorandum also stated that VEMCO would send a copy of VEMCO's acceptance of a subscription offer to the investor if the investor's offer were accepted. VEMCO also prepared in Oklahoma related subscription documents and articles of limited partnership.

E.F. Hutton is a broker-dealer of securities with its principal place of business in New York. In 1981 VEMCo entered a sales agency agreement with Hutton regarding VEMCO 1981. VEMCO granted Hutton the exclusive right to solicit offers to buy program units in VEMCO 1981. Potential investors were to make their offers to buy through submitted subscription agreements. Hutton was to reject the offers to buy which it deemed to be from unsuitable investors and forward the remaining offers to VEMCO. VEMCO reserved the right to accept the offers of subscription.

VEMCO transmitted the documents it had prepared in Oklahoma to Hutton in New York. Hutton sent the offering memorandum and related materials to prospective investors in several states. Hutton transmitted VEMCO's offers to sell to prospective investors both orally and by mail from New York and from Hutton branch offices in other states. All Hutton brokers who had contact with plaintiffs were located in states other than Oklahoma when the brokers transmitted Hutton's offer to sell and received plaintiff's offers to buy. All plaintiffs executed their subscription agreements, which constituted offers to buy program units in VEMCO 1981, outside Oklahoma and returned them to Hutton in New York. Hutton discarded those potential investors whom it deemed unsuitable and forwarded the remaining proposed subscription agreements to VEMCO in Oklahoma. VEMCO signed and accepted some subscription agreements in Oklahoma and filed articles of partnership with the Oklahoma Secretary of State. From Oklahoma VEMCO mailed to each limited partner a copy of the signed subscription agreement showing acceptance of an investor's offer to buy. The plaintiffs received these letters outside Oklahoma. All plaintiffs were non-residents of Oklahoma at the time VEMCO accepted their subscription agreements.

The limited partnership agreement granted the general partner, VEMCO, the right to require the limited partners to make additional cash contributions to the partnership capital. These additional cash contributions were known as the "assessments." In November, 1981 VEMCO sent written notice to all limited partners requesting an additional contribution equal to 25 percent of their origi-

nal subscription amount. Individual investors counselled with their Hutton brokers as to whether to pay the assessment; generally Hutton recommended that they pay the assessment, which is what most of the plaintiffs did. There is some question over whether Hutton was acting as an agent for VEMCO in regards to the assessment or as a broker for the investors, or both.

24. The undisputed findings of fact of the *Klawans* order on this issue, in pertinent part, are identical to the undisputed facts determined by this Court to be relevant to this seventh motion for summary judgment.

*Discussion*

■ Plaintiffs first assert in their motion for summary adjudication that the issues presented herein are precluded from further adjudication by the order of Judge Noland on the issue of the applicability of the Oklahoma Securities Act under either the doctrine of *res judicata* or the doctrine of collateral estoppel. Alternatively, Plaintiffs contend that the claims asserted in this cause of action are appropriately governed by the Oklahoma Securities Act.

Defendants, on the other hand, argue that Plaintiffs do not have standing to sue under the Oklahoma Act because the offers did not originate in Oklahoma, and, further that neither of the doctrines, *res judicata* or collateral estoppel, is applicable in this case.

As to the claim or issue preclusion questions, Defendants asserted two arguments: 1) that because of the difference in choice of law rules between Florida and Indiana they could not be precluded from challenging the application of Oklahoma law and 2) there is no final judgment in the *Klawans* case on these issues. As to the first issue, the Court has previously dealt with the conflicts of laws application in this order and found it inapplicable to this cause. Therefore, that basis for denying the application of the preclusion doctrines is moot.

The Court finds that the order of the *Klawans* court does not rise to the level of *res judicata*, as it does not satisfy the test which requires that: 1) there must be a

final judgment on the merits; 2) the decision must be rendered by a court of competent jurisdiction; 3) the parties, or those in privity, must be identical in both suits; and 4) the same cause of action must be involved in both cases. *L.A. Durbin, Inc. v. Jefferson National Bank*, 793 F.2d 1541, 1549 (11th Cir.1986).

Collateral estoppel or issue preclusion forecloses the relitigation of an issue of fact or law. The prerequisites to a finding of collateral estoppel are: 1) the issue at stake must be identical to the one involved in the prior litigation; 2) the issue must have been actually litigated in the prior suit; 3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and 4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. *Id.*, at 1549.

Defendants urge that there is not final judgment in this cause and, therefore, assumedly argues that requirement three above has not been met. Plaintiff asserts that the fact that the decision in question was an order on cross-motions for summary judgment does not preclude the application of collateral estoppel. The Restatement Second on Judgment (1982) states that as to issue preclusion final judgment includes any prior adjudication that is determined to be "sufficiently firm to be accorded conclusive effect."

■ The Court would tend to agree that the doctrine of collateral estoppel is properly applied to this cause of action as to the November, 1988, order of Judge Noland. However, the Court does not feel compelled to base its granting of Plaintiffs motion for summary judgment on that doctrine. The Court has made an independent consideration of the issues raised by Defendants as to the "standing" or nexus question and finds their arguments without merit.

In his November, 1988, order, Judge Noland specifically found that the extent of the activities which took place in and in

connection with Oklahoma created a sufficient nexus with Oklahoma to allow for the application of its Blue Sky laws. That court relied on *Newsome v. Diamond Oil Producers, Inc.*, [1982–84 Transfer Binder] Blue Sky L.Rptr. [CCH 71,869 (D.C.Okla. 1983) ] and *McCullough v. Leede Oil & Gas, Inc.*, 617 F.Supp. 384 (W.D.Okla.1985).

In *Newsome* the court held that the Oklahoma Act applied where purchasers were not Oklahoma residents. The court there stated that the act applies "when any portion of the selling process of securities covered by the Act occurs in Oklahoma." Thus the *Klawans* order states, "the Oklahoma statute applies when an Oklahoma-based issuer originates an offer in Oklahoma and sends it to out of state offerees."

In *McCullough* a Alabama resident purchased securities (interests in an oil well located in Oklahoma) from a Texas issuer who did business in Oklahoma. Plaintiff attempted to invoke the Oklahoma Act because the defendant's Oklahoma office sent the plaintiff some documents relating to the venture. The court in that case declined to find a sufficient nexus under those facts, but did find that when Oklahoma facilities are involved, to some extent, in a transaction, it is appropriate to examine the documents embodying the offer to sell originated in Oklahoma.

Judge Noland also found significant the following principles in determining the applicability of Blue Sky laws; 1) the extent of activity which occurred in the state of question and conversely the fact that a portion of the transaction occurred in another state is not *per se* sufficient to prevent application of the statute, citing *Getter v. R.G. Dickinson & Co.*, 366 F.Supp. 559 (S.D.Iowa 1973); 2) the use of an out-of-state agent to make offers to out-of-state purchasers; the offer originates in the owner's state and that state's securities law applies, citing *State of Oregon v. Jacobs*, 55 Or.App. 406, 637 P.2d 1377 (1981); and 3) if a portion of a securities transaction occurs in a state, even if aimed only at non-residents, that state has a legitimate interest in applying its securities law to the transaction, citing *Lintz*, 613 F.Supp. at 551.

Based on the legal principles expressed in his opinion, Judge Noland concluded that the offer to sell of defendants, including the solicitation of offers to buy, originated in Oklahoma, stating:

VEMCO prepared the offering memorandum in Oklahoma. Numerous attendant forms, necessary for the investment, were also prepared by VEMCO in Oklahoma. VEMCO entered the agency agreement with Hutton from Oklahoma. VEMCO reserved the right to accept offers to buy in Oklahoma. The pertinent documents informed potential investors of the extent of VEMCO's operations in Oklahoma regarding this venture. VEMCO transmitted the documents it had prepared from Oklahoma to Hutton in New York. Hutton sent the offers to buy which it had not rejected to VEMCO in Oklahoma. VEMCO filed articles of partnership with the Oklahoma Secretary of State. VEMCO mailed signed subscription agreements from Oklahoma to the investors who became limited partners.

These actions indicate that the offers to sell originated in Oklahoma and the Oklahoma Securities Act should apply. The Act applies because a portion of the selling process of securities covered by the Act took place in Oklahoma. *Newsome, supra*. Examination of the relevant documents reveals that the documents "embodying" the offer to sell originated in Oklahoma. *McCullough, supra*. A significant portion of the transaction, including preliminary steps and the preparation and extension of the offers to sell, took place in the state whose law is sought to be applied. *Green, supra*. That other portions of the selling process may have taken place elsewhere is insufficient to prevent the application of Oklahoma law. *Getter, supra*. Though the defendants may have used out of state agents to further the offers to and from out of state purchasers, the offers to sell originated in Oklahoma. *Jacobs, supra*. Because of the number and extent of activities occurring within Oklahoma regard-

ing these transactions, Oklahoma has a legitimate interest in having its law applied to this case. *Lintz, supra.*

The defendants attempt to premise the inapplicability of Oklahoma law on the fact that they were out of state agents for VEMCO. However, the question of which other state's laws might also apply to these transactions is not before the Court on the cross-motions for summary judgment. The defendant's arguments notwithstanding, the facts and the law do not support the defendants' contention that Oklahoma law should not apply to the counts in question. In sum, the extent of the activities which took place in and are connected to Oklahoma create a sufficient nexus with Oklahoma to apply its securities law.

This Court, as was the *Klawans* court, is convinced that there is sufficient nexus with Oklahoma to satisfy the requirement of the Oklahoma statute that the offer originated in Oklahoma pursuant to Section 413 of that Act. The Court does not feel compelled to reiterate the various "facts" which cumulatively support this finding. The order of Judge Noland, which the Court has quoted extensively, is eloquent in its recitation of such explication.

## VII. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' OKLAHOMA NON–REGISTRATION CLAIM (COUNT VI) AND DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT VI

The Court has at last arrived at consideration of the eighth and ninth cross-motions for summary judgment. In their motion Plaintiffs assert that the securities sold to them (the VEMCO 1981 units) were not registered in Oklahoma and were not exempt from registration pursuant to Title 71, Section 401(b)(9)(C), Okla.Stat. (as it existed in 1981) [now codified as Section 401(b)(9)(B)] [hereinafter referred to as Section 401(b)(9)(C)]. Defendants, on the other hand, assert that the Oklahoma Securities Act is inapplicable, and, in the alternative, that the VEMCO 1981 offering fulfilled all requirements of the Oklahoma private offering memorandum.

As to the first allegation of Defendants, this Court has in the preceding section fully discussed the issue of the applicability of Oklahoma Blue Sky laws. The Court has determined that the statute is to be applied. Therefore, there will be no further discussion of this issue in regard to these cross-motions for summary judgment. The Court is then faced only with the question of whether or not the VEMCO 1981 offering complied with the requirements of the Oklahoma statute which provided exemption from that state's registration of securities provisions.

## FINDINGS OF FACT

In considering these cross-motions for summary judgment, the Court incorporates by reference all applicable prior findings of fact made in this order in relation to other motions for summary judgment. The Court makes the following additional undisputed findings of fact relevant to these cross-motions:

1. Section 301 of the Oklahoma Securities Act provides in pertinent part:

It is unlawful for any person to offer or sell any security in this state unless (1) it is registered under this act or (2) the security or transaction is exempted under Section 401.

2. It is undisputed that the VEMCO 1981 units purchased by Plaintiffs were not registered under the Oklahoma Act.

3. Section 401(b) of the Oklahoma Act sets the standards for qualifying for an exemption from registration. Section 401(b)(9)(C) provided that transactions are exempt from Section 301 (registration) as follows:

For any sale by an issuer now or hereinafter exempted from Section 5 of the Securities Act of 1933 by virtue or a rule or regulation adopted by the United States Securities and Exchange commission (hereinafter SEC) pursuant to Section 4(2), of such act [requiring that the conditions of SEC Rule 146 (adopted 1976, repealed effective June 30, 1982) are met] and, if in addition:

1. that the commissions or other remuneration, direct or indirect, paid as a result of such sale shall not exceed those allowed for securities registered under this act;

2. that such commissions or remuneration be paid only to broker-dealers, or agents of broker-dealers, as those terms are defined in Section 2 of the Oklahoma Securities Act, registered in this state pursuant to Section 202 of the Oklahoma Securities Act; or to broker-dealers and their agents who are registered with the United States Securities and Exchange Commission although not falling within the provisions of Section 2 of the Oklahoma Securities Act; and

3. that the issuer files with the Administrator a notice of intent to claim exemption under this subparagraph, in such form as the Administrator shall determine, then (10) days prior to the first offering or sale pursuant to such claim, containing the following information:

a. the size of the offering to be made;

b. the direct or indirect principals of the issuer or any affiliated entity;

c. the type of securities to be offered;

d. any suitability requirement which will be employed in determining to whom offers or sales are to be made;

e. the nature of the issuer's business; and

f. the nature and amount of any commissions or remuneration, direct or indirect, which will be paid in connection with any sale under this offering.

4. Section 401(e) of the Oklahoma Securities Act provides that, in a proceeding under the act for an exemption or an exception from a definition, the burden of proof is upon the party claiming said exemption or exception.

5. Section 408 of the Oklahoma Securities Act provides a civil remedy for violation of Section 301, in pertinent part, as follows:

(a) Any person who

(1) Offers or sells a security in violation of Sections 201(a), 301 or 404(b) of this title ..., is liable:

(i) in the case of an offer or sale of a security by such means, to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at ten percent (10%) per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security

...

6. SEC Rule 146 was adopted in 1976 "to provide, to the extent feasible, objective standards upon which responsible businessmen may rely in raising capital" under Section 4(2) of the Securities Act, for transactions not involving any public offering. In order to benefit from the protection of the rule, *all* its conditions must be satisfied and the issuer claiming the umbrella of the rule has the burden of establishing that it has satisfied the conditions. Note 3 to Rule 146.

7. The following conditions are promulgated by SEC Rule 146:

(b) *Conditions to be Met.* Transactions by an issuer involving the offer, offer to sell, offer for sale or sale of securities of the issuer that are part of an offering that is made in accordance with all the conditions of this rule shall be deemed to be transactions not involving any public offering within the meaning of Section 4(2) of the Act.

(1) For purposes of this rule only, an offering shall be deemed not to include offers, offers to sell, offers for sale or sales of securities of the issuer pursuant to the exemptions provided by Section 3 or Section 4(2) of the Act or pursuant to a registration statement filed under the Act, that take place prior to the six-month period immediately preceding or after the six-month period immediately following any offers, offers for sale or sales pursuant to this rule, *Provided,*

That there are during neither of said six-month periods any offers, offers for sale or sales of securities by or for the issuer of the same or similar class as those offered for sale or sold pursuant to this rule.

(2) Transactions by an issuer which do not satisfy all of the conditions of this rule shall not raise any presumption that the exemption provided by Section 4(2) of the Act is not available for such transactions.

(c) *Limitation on Manner of Offering.* Neither the issuer nor any person acting on its behalf shall offer, offer to sell, offer for sale, or sell the securities by means of any form of general solicitation or general advertising, including but not limited to the following: (specific restrictions omitted).

(d) *Nature of offerees.* The issuer and any person acting on its behalf who offer, offer to sell, offer for sale or sell the securities shall have reasonable grounds to believe and shall believe:

(1) Immediately prior to making any offer, either:

(i) That the offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or

(ii) That the offeree is a person who is able to bear the economic risk of the investment; and

(2) Immediately prior to making any sale, after making reasonable inquiry, either:

(i) That the offeree has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or

(ii) That the offeree and his offeree representative(s) together have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of the prospective investment and that the offeree is able to bear the economic risk of the investment.

(e) *Access to or Furnishing Information.*

(1) Either

(i) Each offeree shall have access during the course of the transaction and prior to the sale to the same kind of information that is specified in Schedule A of of the Act, to the extent that the issuer possesses such information or can acquire it without unreasonable effort or expense; or

(ii) Each offeree or his offeree representative(s), or both, shall have been furnished during the course of the transaction and prior to sale, by the issuer or any person acting on its behalf, the same kind of information that is specified in Schedule A of the Act, to the extent that the issuer possesses such information or can acquire it without unreasonable effort or expense. This condition shall be deemed to be satisfied as to an offeree if the offeree or his offeree representative is furnished with information, either in the form of documents actually filed with the Commission or otherwise, as follows: (text of subsection (a) omitted).

(b) In the case of all other issuers, the information that would be required to be included in a registration statement filed under the Act on the form which the issuer would be entitled to use, provided, however, that:

A. the issuer may omit details or employ condensation of information if, under the circumstances, the omitted information is not material or the condensation of information does not render the statements made misleading. (Note: to subparagraph A states that the burden of proof of establishing immateriality is on the issuer). (remainder of text omitted).

(2) The issuer shall make available, during the course of the transaction and prior to sale, to each offeree or his offeree representative(s) or both, the opportunity to ask questions of, and receive answers from, the issuer or any person acting on its behalf concerning the terms and conditions of the offering and to obtain any additional information, to the extent the issuer possesses such informa-

tion or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information obtained pursuant to paragraph (e)(1) of this section; and

(3) The issuer or any person acting on its behalf shall disclose to each offeree, in writing, prior to sale:

(i) Any material relationship between his offeree representative(s) or its affiliates and the issuer or its affiliates, which then exists or mutually is understood to be contemplated or which has existed at any time during the previous two years, and any compensation received or to be received as a result of such relationship.

(ii) That a purchaser of the securities must bear the economic risk of the investment for an indefinite period of time because the securities have not been registered under the Act and, therefore, cannot be sold unless they are subsequently registered under the Act or an exemption from such registration is available; and

(iii) The limitations on disposition of the securities set forth in paragraph (h)(2),. (3), and (4) of this section.

(f) *Business Combinations.* (text omitted)

(g) *Number of Purchasers*

(1) The issuer shall have reasonable grounds to believe, and after making reasonable inquiry, shall believe, that there are no more than thirty-five purchasers of the securities of the issuer from an issuer in any offering pursuant to the rule.

(2) For purposes of computing the number of purchasers for paragraph (g)(1) of this section only:

(i) The following purchasers shall be excluded: (specific exclusions omitted)

(h) *Limitations of Disposition.* (text omitted)

(i) *Report of offering.* (text omitted)

8. Schedule A as referred to in SEC Rule 146(e)(1) may be found at 15 U.S.C. Section 77aa and explicates the information required to be furnished to potential investors. Schedule A lists thirty-two areas of information which an issuer should furnish. The following areas of informational requirements are relevant to the motions for summary judgment here under consideration. Number 4 requires disclosure of:

> [T]he names and addresses of the directors or persons performing similar functions, and the chief executive, financial and accounting officers, chosen or to be chosen if the issuer be a corporation, association, trust, or other entity; of all partners, if the issuer be a partnership; and of the issuer, if the issuer be an individual; and of the promoters in the case of a business to be formed, or formed within two years prior to the filing of the registration statement.

Also relevant to the issues raised in the motions for summary judgment is Number 16, Schedule A, which requires disclosure of:

> [T]he price at which it is proposed that the security shall be offered to the public or the method by which such price is computed and any variation therefrom at which any portion of such security is proposed to be offered to any persons or classes of persons, other that the underwriters, naming them or specifying the class. A variation in price may be proposed prior to the date of the public offering, but the Commission shall immediately be notified of such variation.

9. Defendant Viking, through its Tulsa, Oklahoma counsel, filed a notice dated February 5, 1981, with the Oklahoma Securities Commission claiming exemption of the VEMCO 1981 units from registration under Section 401(b)(9)(C).

10. J.P. Bryan, an employee of Defendant Hutton, was a member of the board of directors of Defendant Viking from shortly after its formation in January, 1981, until his resignation from the Board on January 7, 1982.

11. The offering memorandum purported, at pages 55 to 57, to identify and describe all the directors of Defendant Viking.

12. The offering memorandum did not disclose that Mr. Bryan was a director of Defendant Viking and did not give any

description of his background or qualifications.

13. The Notice of Intent to Claim Exemption under Section 401(b)(9)(C) provided to the Oklahoma Securities Administrator did not identify Mr. Bryan as a director of Defendant Viking.

14. The offering memorandum stated that the "minimum purchase" allowed in the offering was thirty (30) program units or, in monetary terms, $150,000.00.

15. The offering memorandum did not disclose that sales of program units in amounts less than the stated minimum were contemplated in the Sales Agency Agreement between Defendants Viking and Hutton, or that such sales in amounts below the stated minimum could be made. The Agency Sales Agreement actually provided:

> If, at the Closing Date, less than all of the Units have been subscribed for, you (meaning Hutton) may offer and the General Partner may accept Subscriptions from Investors for less than thirty Units, if it can be done without violating applicable securities laws.

16. Sales were made to at least ten (10) purchasers in amounts less than $150,-000.00. Defendant Hutton acted as sales agent in making these sales below the minimum sale price and number of units stated in the offering memorandum, and, therefore, had actual knowledge of these sales.

17. Counsel for Defendant Viking, the firm of Conner & Winters, who drafted the private offering memorandum stated that if they had been aware of the fact that Mr. Bryan was a director of VEMCO the information would have been included in the memorandum because the S–1, technical form, and Rule 146 required that all directors be disclosed.

18. Plaintiffs have tendered their interests in the VEMCO 1981 program to Defendants.

## DISCUSSION

In opposition to Defendant's motion for summary judgment, Plaintiffs assert that certain portions of Defendant's supporting documentation should be disregarded insofar as they purport to express legal conclusions. As it did in regard to the affidavit of Professor James Mofsky, the Court will disregard any attempt by expert witnesses to instruct the Court on the requisite legal conclusions in regard to these cross-motions for summary judgment.

Plaintiffs' motion for summary judgment asserts that in order to establish their non-registration claim they must show that: 1) Plaintiffs purchased a security; 2) that was not registered; 3) that Defendants were the persons who either (a) sold the security to Plaintiffs or (b) materially participated in such sale; and 4) the sale was not exempt under Section 401 of the Oklahoma Act. See, *Cook v. Pepco, Inc.*, [1986–87 Transfer Binder] Blue Sky L.Rep. (CCH) 72,411 (Okla.Dt.Ct.1986).

 The burden is on a defendant to prove that a security is exempt from registration. In order to do so a defendant must prove "each and every element of any exemption" which is relied upon by the defendant. *Id.*, at 71,866. As to element four of the elements to be established, Plaintiffs further contend that Defendants cannot prove entitlement to the exemption of Section 401(b)(9)(C) because:

1. The notice of intent to claim the exemption failed to disclose all of the "direct or indirect principals of the issuer or any affiliated entity" as required by Section 401(b)(9)(C)(3)(b); and/or

2. The sales were not exempt under SEC Rule 146 because the offering memorandum did not disclose the full terms or the sale; and/or

3. The sales were not exempt under SEC Rule 146 because the offering memorandum did not disclose the directors of Viking.

Defendants, understandably, argue that the VEMCO offering fully complied with SEC Rule 146 and the Oklahoma exemption provisions. As to the omissions raised as to the disclosure of Mr. Bryan as a director, Defendants urge the Court to find that pursuant to Rule 146(e)(1)(ii)(b)(A) they were entitled to omit this detail or "employ condensation of information if, under the

circumstances, the omitted information is not material or the condensation of information does not render the statements made misleading." Defendants make a similar argument as to the "price variance" argument of Plaintiffs, that the failure to disclose was not material and therefore not a basis for denying Defendants benefit of the claimed exemption.

As to the elements necessary to establish the claim of nonregistration, the Court has examined the cross-motions for summary judgment and responses thereto, and, has determined that the only element which is in dispute is element four, whether or not the sale of these securities is entitled to an exemption under Section 401 of the Oklahoma Securities Act. The other elements are therefore established for purposes of these cross-motions.

The only asserted exemption claimed by Defendants is found at Section 401(b)(9)(C) and is, therefore, the only exemption provision discussed by this Court. Section 401(b)(9)(C) imposes certain requirements which must be met in order to qualify for an exemption under that section. At the time of the VEMCO 1981 offering, Defendants were required to comply with the requirements of SEC Rule 146 as well as several requirements of the Oklahoma statute.

The only requirements Plaintiffs' motion asserts were violated by Defendants are Section 401(b)(9)(C)(3)(b) and SEC Rule 146(e)(1)(i) [as explicated in Schedule A, 15 U.S.C. Section 77aa]. (In opposition to Defendants' motion for summary judgment, Plaintiffs assert violation of Section 401(b)(9)(C)(2), Rule 146(c) and (g) and the accounting of "offerees" under Rule 146 but those issues are not raised in their motion for summary judgment. Based on the Court's resolution of the issues raised by Plaintiffs' motion, the Court will not consider these issues. For the purposes of these cross-motions for summary judgment, the Court concludes that the remaining requirements of the Oklahoma exemption section and SEC Rule 146 were complied with by Defendants in the VEMCO 1981 offering.

The Court must address the question of whether or not materiality is an element of the disclosure requirements of Section 401 and SEC Rule 146, and, if it is whether or not the omissions of the name of Mr. Bryan as a director and the omission of the alternative minimum purchase were immaterial and not required to be disclosed.

The SEC has defined the terms "material" to include that information "which an average prudent investor ought reasonably to be informed before purchasing the security registered." *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 696 (5th Cir.1971). This definition of "material" does not burden plaintiffs with a causation test; a plaintiff does not have to prove the sale would not have happen absent the misrepresentation or omission. *supra*, at 696. A material fact is one where there is a substantial likelihood that disclosure of that fact would have been considered significant by "a reasonable investor." *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

Defendants have admitted that J.P. Bryan was a Hutton vice-president, sales agent of VEMCO 1981 program, and on the Board of Directors of Viking at the time the sales of securities were made in this case. Further, it is undisputed that Mr. Bryan was not disclosed to the Oklahoma Securities Commission (due according to Defendants to the fact he had not been appointed at the time of the report to the commission) nor was his name disclosed to the offerees of the program by means of the private offering memorandum.

Defendants assert that the failure to disclose under Rule 146 is excused by the operation of Rule 146(e)(1)(ii)(b)(A). The Court cannot agree that that section excuses the disclosure of a director of the general partner, Viking. The disclosure of the names and addresses of all directors of Viking was specifically required by Rule 146(e)(1)(i), which, in this Court's eye, is a measure of the "materiality" of such information.

While Defendants may have been able to omit some of the details of Mr. Bryan's directorship, or condense them, the Court cannot agree that the complete omission of Mr. Bryan's existence as a Viking director is permissible within Rule 146(1)(ii)(b)(A). The Court specifically concludes that the failure to disclose the directorship of Mr. Bryan is information that would be considered by a "reasonable investor" as significant to the an investment decision. It is not a question of whether or not the disclosure of Mr. Bryan's name would have prevented the sales in question, but rather whether or not it was "reasonably" significant to an investment decision. The Court finds it was material and, therefore, the omission is sufficient to defeat Defendants' asserted exemption pursuant to Section 401 of the Oklahoma Securities Act.

Having found that the failure to disclose the directorship of Mr. Bryan in the private offering memorandum was material, the Court is not compelled to discuss the remaining two issues: whether or not the failure to disclose Mr. Bryan's directorship to the Oklahoma Securities Commission, or, failure to disclose the "price variance." However, as to the "minimum subscription" issue, the Court states, without extensive discussion, that it concludes, on the information submitted in support of the cross-motions, that the omission of such proposed price variance was also "material" and could be an alternate basis for granting summary judgment to Plaintiffs.

As can be ascertained from no more that a quick perusal of this order, this case has taken an inordinate amount of this Court's scarce civil resources. This judge and her staff has invested in excess of six weeks in reviewing the pleadings, researching the issues, and drafting this seventy-two (72) page order. Unfortunately for the state of this Court's civil docket, this case is rapidly becoming a case of typical magnitude, rather than a rarity. Such excessive consumption of judicial resources for a single case bodes ill for the future progress of all civil cases in this Court.

Accordingly, it is

ORDERED that Plaintiffs' motion for summary judgment on counterclaims be denied and Defendants' counterclaims be amended to clearly reflect that Defendants seek indemnity for attorneys' fees and costs *only* as any claims of oral misrepresentations on which Plaintiffs are *not* successful. It is further,

ORDERED that Defendant Hutton's affirmative defenses Thirteen, Twenty–One and Twenty–Three be withdrawn; motion for summary judgment as to Defendants' affirmative defenses one, Defendant Hutton's defense nineteen and Defendant Viking's defense ten be denied; motion for summary judgment as to Defendant Hutton's affirmative defenses four and five and both Defendants' defense three, Defendant Hutton's affirmative defense seven and Defendant Viking's affirmative defense four, Defendant Hutton's defense eight and Defendant Viking's defense five, and Defendant Hutton's eleventh defense be granted, insofar as is consistent with the preceding opinion; and the motion for summary judgment as to Defendant Hutton's defenses sixteen and eighteen and Defendant Viking's defenses nine and thirteen be granted. It is further,

ORDERED that Plaintiffs' motion to submit supplemental authority in opposition to motion for summary judgment on alleged oral misrepresentations be granted; Plaintiffs' objection to Defendant Hutton's response to supplemental authority be denied; and the motion for summary judgment on alleged oral misrepresentations be denied. It is further,

ORDERED that Defendants motion for partial summary judgment against Plaintiffs Barnebey, the Griffins, and Summit Bank be denied. It is further,

ORDERED that the affidavit of Professor James Mofsky be stricken from this cause of action; that the motion for summary judgment of Plaintiff John Miller as to Count I of the amended complaint be granted as to the issue of liability; and the motion for summary judgment as to the issue of damages be denied. It is further,

ORDERED that the assertion that this cause be subject to a traditional conflicts of

law analysis be denied; the motion for summary adjudication that the Oklahoma Securities Act applies to Plaintiffs' purchases of VEMCO 1981 units and for summary judgment as to Defendant Hutton's twenty-second and Defendant Viking's twelfth affirmative defenses be granted; and the Court finds that the Oklahoma Securities Act is applicable to the issues raised by the second amended complaint. And, it is further,

ORDERED that Plaintiffs' motion for summary judgment on Count IV (liability for the claim of non-registration under the Oklahoma Securities Act) be granted and Defendants' cross-motion for summary judgment on Count IV be denied.

DONE and ORDERED.

## EXHIBIT A

[Pages 3–9 of Plaintiffs' Memorandum in Opposition]

The parties here are in agreement that Plaintiffs are entitled to *American Pipe* tolling. The issue is to what extent the benefits of *American Pipe* are available to Plaintiffs. Defendant's position is that *American Pipe* tolling only applies where Plaintiffs' separately filed claims rely upon exactly the same statutes as were the basis of class-wide claims in *Klawans*. Plaintiffs' position is that *American Pipe* tolling applies where the Plaintiffs' separate claims rely upon the same core of facts and upon substantially identical statutes, as well as where the claims depend upon exactly the same statute. In *Klawans*, class-wide claims were asserted under the Oklahoma Securities Act antifraud provisions, under Rule 10b–5, under Section 17 of the Securities Act of 1933, and under Section 12 of the Securities Act of 1933. Insofar as Plaintiffs here have asserted claims under these same statutory provisions, resting upon the same facts, Hutton agrees that Plaintiffs are entitled to benefits of *American Pipe*. In *Klawans*, however, class-wide claims were not asserted under the Florida or Indiana Securities Act, although a number of named Plaintiffs in *Klawans* did assert claims under these

Florida and Indiana statutes as individual claims.

It is Plaintiffs' view that, where the substantive law is essentially identical, the fact that the class action claims relied upon federal statutes while the present individual claims rely upon a state statute, *American Pipe* does apply to the "new" state law claims.

*Cullen v. Margiotta,* 811 F.2d 698 (2nd Cir.1987) is the case most directly addressing the issue. In *Cullen,* plaintiffs initially filed a class action in state court asserting claims based on state law. The state law claims were dismissed. The *Cullen* plaintiffs then filed a new suit in *federal court* asserting claims under the federal law of RICO and 42 U.S.C.A. § 1983. The plaintiffs' federal law claims depended upon substantially the same facts as were the basis of plaintiffs' original state-law class action. The federal district court declined to give *American Pipe* tolling to the *Cullen* plaintiffs, adopting Hutton's position that the "different statutes" precluded such effect. On appeal, the Second Circuit reversed in an opinion which succinctly summarizes and adopts Plaintiffs' position here:

Notwithstanding the differences between the legal theories advanced by plaintiffs in the state court action and those advanced in the present action, we are persuaded that the *American Pipe* doctrine has applicability to the present action. The functional purposes of a statute of limitations is to prevent "stale" lawsuits, i.e., suits after "evidence has been lost, memories have faded, and witnesses have disappeared." *American Pipe,* 414 U.S. at 554, 94 S.Ct. at 766. In *American Pipe* and *Crown, Cork,* 462 U.S. at 353, 103 S.Ct. at 2397, the Supreme Court held that tolling based on the filing of a prior class action is consistent with these purposes. Consequently, *American Pipe* tolling is properly extended to claims of absent class members that involve the same evidence, memories, and witnesses as were involved in the initial putative class action. *See United Airlines, Inc. v. McDonald,* 432 U.S. 385, 393–94 n. 14, 97

S.Ct. 2464, 2469–70, n. 14, 53 L.Ed.2d 423 (1977); *Crown, Cork,* 462 U.S. at 355, 103 S.Ct. at 2398 (Powell, J., concurring, joined by Rehnquist and O'Connor, JJ.); *American Pipe,* 414 U.S. at 562, 94 S.Ct. at 770 (Blackmun, J., concurring); *Escott v. Barchris Construction Corp.,* 340 F.2d 731, 734 (2d Cir.) (tolling applies when through initial class action "defendants were thus made aware of the nature of the evidence that would be needed at trial"), *cert. denied,* 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965).

. . . . .

Obviously there are differences between the state-law causes of action that were asserted in the putative state class action and the federal causes of action asserted here that are pertinent for some purposes: for example, the civil RICO elements that have a bearing on what state statute of limitations is most analogous, *see,* Part III, C.1, *supra.* But these elements are entirely peripheral. The differences that distinguish a civil RICO cause of action from state-law causes of action for purposes of determining which statute of limitations to apply are not the sorts of elements that suggest that *American Pipe* tolling would be inconsistent with the functional goal of statutes of limitations. For example, no special preservation of witnesses or evidence would ordinarily be necessary as to the factors of effect on interstate commerce, degree of exposure to liability (single damages vs. treble damages plus attorneys' fees), the timing of the predicate acts (whether they occurred within a 10–year period), or the existence of a RICO enterprise. . . . The challenged conduct is what is common to both the RICO and the state-law claims, and that is what the defendant must be alerted to in order to preserve its evidence, record its recollections, and keep track of its witnesses. The state court complaint clearly challenged the conduct that is at issue here, and we would be hard pressed to conclude that that complaint was not sufficient to alert the defendants sued there to preserve the evidence regarding that conduct.

Unlike Judge Meskill in his dissenting opinion, *post,* we do not regard the fact that the state court action was premised on different legal theories as a reason not to apply *American Pipe* tolling to save the claims of class members who were not named plaintiffs in the state court action. It is not a flaw under that doctrine that the first action did not alert the defendant to have its lawyers research the applicability of a particular statute or rule of common law. Indeed, limiting *American Pipe* tolling to the identical "causes of action" asserted in the initial class action would encourage and require absent class members to file protective motions to intervene and assert their new legal theories prior to class certification, thereby producing the very results the New York courts seek to prevent by such tolling, i.e., "court congestion, wasted paperwork and expense."

. . . . .

In sum, because the asserted factual basis of the state court claims was the same as that of the claims asserted here and the County was made a defendant to that action, the running of the statute on the claims of the absent plaintiff class members against the County was thereby tolled.

*Cullen v. Margiotta,* at 720.

The position of the Second Circuit in *Cullen* appears sound in light of the Supreme Court's decision in *Crown, Cork & Seal, supra.* There, three justices (to whom Hutton itself points) stated:

Similarly, when a plaintiff invokes *American Pipe* in support of a separate lawsuit, the district court should take care to ensure that the suit raises claims that "concern the same evidence, memories and witnesses as the subject matter of the original class suit" so that "the defendant will not be prejudiced."

*Crown, Cork & Seal Co. v. Parker,* 462 U.S. at 355, 103 S.Ct. at 2398, 76 L.Ed.2d at 637.

*In re Com. Oil/Tesoro Petroleum Corp. Sec. Lit.,* 467 F.Supp. 227 (W.D.Tex.1979), at 259–261 uses the analytic approach advocated here by Plaintiffs. The Court analyzed the elements of proof, the burden of proof, and the factual basis of the claims. Because the class-wide claim under Section 10b differed significantly as to elements of proof, burden of proof, and underlying facts, the Court held that a class-wide 10b claim did *not* toll a subsequent individual claim under Section 11 of the Securities Act of 1933. The analysis in *In re Com. Oil* would lead to the opposite result here— where the elements, burdens of proof and facts underlying Plaintiffs' Florida and Indiana Acts anti-fraud claims are the *same* as the class-wide claims in *Klawans*. See, *In re Com. Oil, supra,* at 259–260.

Hutton has not even suggested that Plaintiffs' claims under the anti-fraud provisions of the Florida Act or Indiana Act differ as to their elements from the class-wide federal and state law claims asserted in *Klawans*. Hutton has not suggested that material differences exist between the substantive facts of the misrepresentation claims here and those asserted on a class-wide basis in *Klawans*.

In Plaintiffs' view, the beginning point of analysis lies in recognition of the legal identity of Plaintiffs' claims under the Florida and Indiana Acts' anti-fraud provision and the class-wide federal law claims in *Klawans*. F.S.A. § 517.211 provides a civil remedy where securities are offered or sold in violation of F.S.A. § 517.301. The latter provision provides that it is unlawful, in selling securities, to obtain money by means of any false statement of a material fact or any omission to disclose a material fact necessary to make the statements made, not misleading. Section 301 is a *verbatim copy* of Section 17 of the Securities Act of 1933[1] and *Klawans* included a class-wide claim based on these representations under Section 17 of the Securities Act of 1933.

Under Section 211 of the Florida Act, conduct violative of Section 301 is incorporated into the civil remedy provision. When this is done, F.S.A. § 517.211 becomes in all essential respects identical to the express civil remedy provided by Section 12(2) of the Securities Act of 1933. Both F.S.A. § 517.211 and Section 12(2) provides the same remedy (statutory rescission) where a purchase of securities has been induced by false statements of material fact or omissions to disclose material facts. The Supreme Court of Florida has recently observed that:

> The effect of section 517.211 is similar to that of federal section 12(2), except that whereas 12(2) protects only buyers, section 517.211 protects both buyers and sellers.

*E.F. Hutton v. Rousseff,* 537 So.2d 978 (1989).

The congruity of F.S.A. § 517.211 and § 517.301 to Sections 17 and 12(2) of the Securities Act of 1933 is pervasive. Nor is the congruity the result of mere chance. For over fifty years, the Florida Act has literally incorporated the federal remedies under Florida law. F.S.A. § 517.241(3) provides:

> The same civil remedies provided by laws of the United States for the purchasers or sellers of securities, under any such laws, in interstate commerce, extend also to purchasers or sellers of securities under this chapter.

The Florida Supreme Court has observed that the provision incorporated federal remedies (i.e. Section 12(2) of the Securities Act of 1933) into the Florida Act. *Oppenheimer & Co., Inc. v. Young,* 456 So.2d 1175 (Fla.1984). In short, the Plaintiffs' claims as to oral misrepresentations here are *not* different than the class-wide claims in *Klawans,* factually or legally.

The foregoing applies equally to a comparison of the Indiana Act and the *Klawans* class-wide securities anti-fraud claims. The Indiana Act is in all pertinent

---

**1.** The Florida statute differs from Section 17 only in its omission of the jurisdictional predi- cate of "use of mails" or "interstate commerce."

aspects identical to the Florida Act. Ind. Code § 23-2-1-19.

This Court should adopt and follow the ruling of the Second Circuit in *Cullen*, and hold that, under the circumstances of this case, *American Pipe* tolling applies to Plaintiffs' anti-fraud claims under the Florida and Indiana Securities Acts. So viewed, Plaintiffs' Count II and Count V would be judged as if they were filed on May 17, 1983.

[Pages 11–15 of Plaintiffs' Memorandum in Opposition]

## Part IV: Count I, Plaintiffs' Florida Securities Act is Also Entitled to the Benefit of American Pipe Tolling

Count I of Plaintiffs' Amended Complaint presents a claim for sale of securities in violation of the registration provision of the Florida Securities Act. This claim substantially replicates the class-wide non-registration claim in *Klawans* based on the Oklahoma Securities Act. F.S.A. § 517.211(1) provides the basic civil liability provision for unlawful sales of unregistered securities: "Every sale made in violation of ... s. 517.07 ... may be rescinded at the election of the purchaser." Liability is imposed upon "the person making the sale and every ... agent of or for the seller ... [who] participated or aided in making the sale."

Section 517.07 simply provides that it is unlawful to sell an unregistered security, unless the sale is exempt from registration. It provides:

No security ... unless sold in any transaction exempt under any of the provisions of s. 517.061 shall be sold or offered for sale within this state unless such securities have been registered.

A purchaser's prima facie case under F.S.A. § 517.211(1) requires proof only of these elements: (1) Plaintiffs purchased a security; (2) Defendants were persons who sold the security; and (3) the security was not registered. Under the Florida Act, Defendants must plead and prove any claimed exemption as an affirmative defense. F.S.

A. § 517.171; *Weinberg v. Pennington*, 462 So.2d 862 (Fla.App. 3 Dist.1985).

*Klawans* included a class-wide non-registration claim under the Oklahoma Securities Act. That claim is replicated here as Plaintiffs' Count VI. The elements of an Oklahoma non-registration claim are not materially different from Count I. Section 301 of the Oklahoma Securities Act (parallel to F.S.A. § 517.07) simply provides:

It is unlawful for any person to offer or sell any security in this state unless (1) it is registered under this act or (2) the security or transaction is exempt under Section 401.

The parallel to F.S.A. § 517.211(1), Section 408(a) of the Oklahoma Act, imposed civil liability for sales of unregistered, nonexempt securities. Section 408(a) in pertinent part states:

Any person who (1) offers or sells a security in violation of Section(s) ... 301 ... is liable ... to the person buying the security from him ....

As under the Florida Act, the Defendants must plead and prove any claimed exemption as an affirmative defense. Section 401(e) of the Oklahoma Act replicates F.S.A. § 517.171. Like F.S.A. § 517.211(1), the Oklahoma statute extends liability for unlawful sales to "every person who materially participates or aids in a sale." Okla. Stat. tit. 71 § 408(b).

Admittedly, there are some differences between the Plaintiffs' Count I non-registration claim and the class-wide non-registration claim under the Oklahoma Act in *Klawans*. But these differences do not preclude the use of *American Pipe* tolling as to Plaintiffs' Count I. In *Cullen*, the court noted there were some "differences between the state law causes of action that were asserted in a putative state class action and the federal causes of action asserted here. *Cullen, supra*. The issue, as *Cullen* put it, was one of prejudice—that is, considering all the facts and circumstances, would the Defendant be prejudiced if the "new theory" were allowed by being unfairly surprised. The focus in resolving the issue of prejudice was on the Defen-

dants' awareness of the need to preserve witnesses, exhibits and evidence.

In its Memorandum, Hutton does *not* suggest that it has been "prejudiced" with regard to witnesses, exhibits or evidence. Indeed, logically Hutton could not honestly make any such claim. The *Klawans* action includes numerous Florida purchasers (*e.g.*, Mr. Miller, here) who asserted individual claims under the non-registration provisions of the Florida Act. Faced with these claims for conduct violative of the Florida Act's non-registration provision, Hutton would have been motivated to preserve whatever evidence, witness and the like which bore upon the issues pertinent to Plaintiffs' Count I.

Even as to the exemption defenses, there is a substantial parallel between the facts pertinent to the Oklahoma exemption and those pertinent to the Florida exemption. The Florida exemption claimed in F.S.A. § 517.061(12) and one of the conditions to that exemption (compliance with which is in dispute here) is:

3. Prior to the sale, each purchaser or his representative, if any, is provided with or given reasonable access to, full and fair disclosure of all material information.

The exemption under the Oklahoma Act which Hutton claims to be relying upon, is Section 401(b)(9). One of the conditions of that exemption is compliance with the requirements of Rule 146. Rule 146 in turn requires as a condition that:

Each offeree or his offeree representative(s), or both, shall have been furnished during the course of the transaction and prior to sale, by the issuer or any person acting on its behalf, the same kind of information that is specified in Schedule A of the Act ....

17 C.F.R. § 230.146(e)(i)(ii).

In this case, evidence as to compliance or non-compliance with the disclosure requirements of the Florida exemption will parallel evidence of non-disclosure of facts required to be disclosed by Rule 146 and Schedule A. In short, the evidence will show that not all purchasers in Florida received the POM

"prior to the sale" as required by the conditions of the Florida exemption. Such evidence would tend to prove, simultaneously, the non-disclosure of information required to be disclosed under the Oklahoma exemption.

There are other essentially identical elements of the Oklahoma and Florida exemptions. Both prohibit use of "general advertising or general solicitation." Both limit the number of purchasers. Both prohibit payment of a commission to a party who is not a registered broker/dealer. *Cf.*, Okla. Stat. tit. 71 § 401(b)(9)C2 and F.S. (1981) § 517.061(12)(a)(2) [general advertisements]. *Cf.*, Okla.Stat. tit. 71 § 401(b)(9)C2 and F.S. (1981) § 517.061(12)(a)(4) [prohibited commissions to non-broker/dealers]. This essential identity of the terms of the exemptions is no accident. These are Oklahoma's and Florida's efforts to achieve uniformity and harmony with the then existing Rule 146 private placement exemption under the Securities Act of 1933.

The only point upon which the Florida exemption differs from the Oklahoma exemption in any material respect is the "Fifth Condition" of the Florida exemption. F.S. (1981) § 517.061(12)(a)(5). The Fifth Condition required inclusion in the POM of an accurate statement of a right of avoidance for persons subscribing in Florida to purchase VEMCO units. Elsewhere, Hutton has admitted that the issue of compliance with the Fifth Condition is a pure question of law—the POM either did or did not contain the requirement statement. There was, thus, no witnesses, exhibits or evidence to be preserved. Hence, no prejudice accrues to Hutton. Nor any surprise would occur—for Hutton knew it would have to prove compliance with the Fifth Condition, because *Klawans* included at least nine investors' claims of sales in violation of the Florida non-registration provisions.

Upon proper analysis, therefore, Plaintiffs' Florida Act (Count I) non-registration claim is substantially identical to the class-wide claims alleging violations of the Oklahoma's non-registration requirements asserted in *Klawans*. This parallel exists as

to the elements of Plaintiffs' prima facie case as well as to virtually all of the elements that are disputed as to Hutton's exemption claims. Absent prejudice to Hutton, the minor difference between the Oklahoma and Florida exemption provisions do not warrant a refusal to apply *American Pipe* tolling to Plaintiffs' Count I.